UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | |
|---|---|
| **NICHOLAS SANDMANN**, by and through his parents and natural guardians, **TED SANDMANN and JULIE SANDMANN,** | Civil Action No. 2:19-cv-00056-WOB-CJS |
| Plaintiffs, | |
| | Judge William O. Bertelsman |
| | Magistrate Judge Candace Smith |
| v. | |
| **NBCUNIVERSAL MEDIA, LLC,** | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

I.  INITIAL STATEMENT ..................................................................................... 1

II. INTRODUCTION ............................................................................................ 1

III. BACKGROUND AND PROCEDURAL HISTORY. ...................................... 3

  A.  Background .................................................................................................. 3

  B.  Procedural History. ................................................................................... 18

IV. ARGUMENT ................................................................................................. 19

  A.  Standard of Review. .................................................................................. 19

  B.  Elements of Defamation. .......................................................................... 20

  C.  Statements that are not of and concerning Sandmann cannot support a cause of action for defamation. ...................................................................................................... 21

  D.  Statements that constitute pure opinion are not actionable as a matter of law .............. 23

    1.  Statements characterizing the conduct depicted on the Taitano Video constitute pure opinion, as NBCUniversal disclosed the facts on which they were based by showing or linking to the Taitano Video. ................................................................................ 24

    2.  NBCUniversal is not liable for publishing or republishing Phillips's and other eyewitnesses' statements regarding their subjective perceptions about the incident, as such statements constitute pure opinion. ....................................................................... 28

    3.  NBCUniversal is not liable for republishing the Diocese of Covington's, Covington Catholic High School's, or the Mayor of Covington's statements condemning the incident, as such statements constitute pure opinion. ......................................................... 31

  E.  Sandmann bases claims on statements that are not capable of defamatory meaning as a matter of law .................................................................................................... 32

  F.  Non-Actionable statements cannot support a claim for "defamation by implication" ...... 33

  G.  Statements that are substantially true are not actionable. ............................................ 34

  H.  The three tweets linking to two online articles and the "Seventh Broadcast" do not constitute republication. ................................................................................... 36

V.  CONCLUSION. ............................................................................................. 36

i

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Air Wis. Airlines Corp. v. Hoeper,*
    134 S. Ct. 852 (2014) ................................................................................................35

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................................19

*Assoc. Gen. Contractors v. Cal. State Counsel of Carpenters,*
    459 U.S. 519 (1983) ..................................................................................................20

*Ball v. E.W. Scripps Co.,*
    801 S.W.2d 684 (Ky. 1990) ......................................................................................21

*Bell v. Courier-Journal and Louisville Times Co.,*
    402 S.W.2d 84 (Ky. 1966) .................................................................................34, 35

*Columbia Sussex Corp. v. Hay,*
    627 S.W.2d 270 (Ky. Ct. App. 1981) .......................................................................21

*Cox v. Hatch,*
    761 P.2d 556 (Utah 1988) .........................................................................................32

*Dermody v. Presbyterian Church, U.S.A.,*
    530 S.W.3d 467 (Ky. Ct. App. 2017) .......................................................21, 31, 34

*E. W. Scripps Co. v. Cholmondelay,*
    569 S.W.2d 700 (Ky. Ct. App. 1978) .......................................................................22

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ..................................................................................................28

*Glogower v. Pulitzer Broad. Co.,*
    1996 U.S. App. LEXIS 22564 (6th Cir. Aug. 2, 1996) ..........................................35

*Greenberg v. Life Ins. Co.,*
    177 F.3d 507 (6th Cir. 1999) ...................................................................................20

*Haynes v. Alfred A. Knopf, Inc.,*
    8 F.3d 1222 (7th Cir. 1993) ......................................................................................28

*Hazime v. Fox TV Stations, Inc.,*
    No. 12-15072, 2013 U.S. Dist. LEXIS 116909 (E.D. Mich. Aug. 19, 2013)..........20

*Hosanna-Tabor Evangelical Lutheran Church & Sch. V. EEOC,*
    565 U.S. 171 (2012).................................................................................................31

*Kentucky Fried Chicken of Bowling Green, Inc. v. Sanders,*
    563 S.W.2d 8 (Ky. 1978) ...........................................................................22

*Lassiter v. Lassiter,*
    456 F. Supp. 2d 876 (E.D. Ky. 2006) ...................................................25, 26, 27

*Loftus v. Nazari,*
    21 F. Supp. 3d 849 (E.D. Ky. 2014) ..........................................................25

*Loricchio v. Evening News Association,*
    476 N.W.2d 112 (Mich. 1991)...................................................................33

*Louisville Times v. Stivers,*
    68 S.W.2d 411 (Ky. 1934)........................................................................22

*Machleder v. Diaz,*
    801 F.2d 46 (2d Cir. 1986).......................................................................27

*McCabe v. Vill. Voice, Inc.,*
    550 F. Supp. 525 (E.D. Pa. 1982) ............................................................24

*Milkovich v. Lorain-Journal Co.,*
    497 U.S. 1 (1990).....................................................................................26

*Mitan v. Davis,*
    243 F. Supp. 2d 719 (W.D. Ky. 2003) ........................................................6

*Salyer v. Southern Poverty Law Ctr., Inc.,*
    701 F. Supp.2d 912 (W.D. Ky. 2009) ........................................................36

*Sandmann v. WP Company, LLC,*
    No. 2:19-cv-0019-WOB-CJS (E.D. Ky. Feb. 19, 2019)................................ *passim*

*Seaton v. Trip Advisor LLC,*
    728 F.3d 592 (6th Cir. 2013) ...................................................................26

*Shields v. Booles,*
    38 S.W.2d 677 (Ky. 1931)........................................................................21

*Smith v. Tipton Cty. Bd. of Educ.,*
    916 F.3d 548 (6th Cir. 2019) ...................................................................19

*Southern Air Transport, Inc. v. American Broadcasting Companies,*
    877 F.2d 1010 (D.C. Cir. 1989)............................................................33, 34

*Squitieri v. Piedmont Airlines, Inc.,*
    No. 317CV441, 2018 U.S. Dist. LEXIS 25485 (W.D.N.C. Feb. 16, 2018) ............26

*Stringer v. Wal-Mart Stores, Inc.,*
    151 S.W.3d 781 (Ky. 2004) .................................................21, 32

*Sweeney & Co. v. Brown,*
    60 S.W.2d 381 (Ky. 1933) ..................................................21, 32

*Toler v. Süd-Chemie, Inc.,*
    458 S.W.3d 276 (Ky. 2015) ................................................20, 21

*WCP/Fern Exposition Servs., LLC v. Hall,*
    No. 3:08-CV-522, 2011 U.S. Dist. LEXIS 32590 (W.D. Ky. Mar. 28, 2011) .................31, 32

*White v. Fraternal Order of Police,*
    909 F.2d 512 (D.C. Cir. 1990) ...............................................33

*Williams v. CitiMortgage, Inc.,*
    498 F. App'x 532 (6th Cir. 2012) ...........................................20

*Williams v. Kanemaru,*
    309 P.3d 972 (Haw. Ct. App. 2013) ........................................26

*Yancey v. Hamilton,*
    786 S.W.2d 854 (Ky. 1989) ..............................................23, 24, 26

## Other Authorities

U.S. Const. amend. I .........................................................1, 25, 27

Fed. R. Civ. P. 12(b)(6) .......................................................18, 20

Restatement (Second) of Torts, § 563 ..........................................21, 34

Restatement (Second) of Torts, § 566 ............................................24

I.    **INITIAL STATEMENT**

On July 26, this Court issued an order dismissing Case No. 19-cv-00019, *Nicholas Sandmann v. WP Company LLC d/b/a The Washington Post* (Doc. # 47, Page ID#: 444 ("The Washington Post Order")). The Court dismissed Sandmann's claims against the Washington Post for several reasons. First, in many instances, the allegedly actionable statements were not "of and concerning" Sandmann. Second, in many instances, the allegedly actionable statements were opinions, not verifiably false and not actionable. In other instances, the statements did not convey a defamatory meaning, and could not support a defamation claim.

Each one of these legal principles apply to NBCUniversal's reporting on this incident and this Court should reach the same conclusion here. This memorandum will demonstrate why those principles, as well as several others not addressed in the Washington Post Order, apply to NBCUniversal's reporting and compel dismissal of Sandmann's complaint.

II.    **INTRODUCTION.**

On January 18, 2019, Nicholas Sandmann donned a Make America Great Again cap and wore it as he marched in a Pro-Life rally in Washington D.C. While exercising his First Amendment rights, he encountered other citizens exercising theirs.

Sandmann eventually found himself face to face with Native American activist Nathan Phillips.  During the encounter, Phillips played a drum and sang, while Sandmann stood still  and grinned. Neither gave ground. Sandmann's Covington Catholic classmates circled around Phillips and Sandmann, many of them laughing, jumping, mock chanting and tomahawk chopping while Sandmann and Phillips continued their stare off.

1

Someone in the crowd captured a close-up video of the encounter between Phillips and Sandmann and uploaded some of that video to Twitter (the Tatiano Video).[1] By January 19, that tweet had generated 2.5 million views. Later that day, national and local media outlets began reporting on what had become a viral sensation. Also on that day, a new, longer video surfaced, as well as accounts by eyewitnesses. Late on the following day, June 20, Nick Sandmann issued a statement. That additional information was incorporated in the evolving story. Two days later, NBCUniversal gave Sandmann the opportunity to offer his view of events in an exclusive interview with Savannah Guthrie of NBC's "Today." Interview excerpts immediately became part of the news reporting.

Because the event had generated much controversy, many reports  included comments from a diverse set of voices who offered their opinion on what they observed. As with many stories, viewers came to divergent conclusions. Some saw a smug teenager mocking a Native American elder. Others saw an innocent young man mistreated by social media trolls. Such "Rashomon"-like divergence of perspectives frequently follow reports on matters of public interest.

Nicholas Sandmann, through his lawyers, rejects the notion that reasonable viewers could come away from the reporting with diverse views on what the story reveals. He brings this suit to enforce his own narrative—that he and his classmates are entirely blameless for their conduct on January 18—and to snuff out any report that dares challenge his point of view. Neither the facts nor the applicable law support that undertaking.

---

[1] In his complaint, Plaintiff refers to the video depicting the encounter between Sandmann and Phillips as the "Taitano Video."  Plaintiff does not allege that the Taitano Video has been altered in any way.  Nor does Plaintiff allege that the Taitano Video does not depict what it purports to depict – the encounter between Sandmann and Phillips along with Sandmann's classmates reacting with laughter, faux chants and tomahawk chops.

Plaintiff alleges that every broadcast at issue includes portions of the Taitano Video.  For convenience this motion will use the term "Taitano Video" as well.

III.    **BACKGROUND AND PROCEDURAL HISTORY.**

A.    **Background**

This Court is already familiar with the underlying events as well as with the immediate reactions of public officials, the Diocese of Covington  and Covington Catholic High School. There is no reason to rehash those events here. We begin, instead, with NBCUniversal's reporting, which focused from the start on the viral controversy engendered by the Taitano Video. Although we will not address or quote in full each of the 24 news reports over a nine-day period that are challenged in the Complaint, we have appended a chart that identifies them and lists the 166 statements within them that Plaintiff Sandmann alleges to be libelous. (*See* Ex. A, Chart of Alleged Actionable Statements.)

The first news report published by NBCUniversal was at 2:42 p.m. on January 19, on the website of NBC Washington, a television station owned by NBCUniversal.  (Doc. 1-11 (Compl., Ex. I), Page ID#: 125.) It consisted of an Associated Press article (allegedly supplemented by NBCUniversal staff) entitled "Catholic Diocese Apologizes After Students in 'MAGA" Hats Mock Native American" (hereinafter "AP Report"). (Doc. 1 (Compl.), Page ID#: 73, ¶ 368.)[2] The AP Report began:

> A diocese in Kentucky apologized Saturday after videos emerged showing students from a Catholic boys' high school mocking Native Americans outside the Lincoln Memorial after a rally in Washington.  The Indigenous Peoples March in Washington on Friday coincided with the March for Life, which drew thousands of anti-abortion protesters, including a group from Covington Catholic High School in Park Hills. Videos circulating online show a teen staring at and standing extremely close to Nathan Phillips, a 64-year-old Native American man singing and playing a drum.

---

[2] Plaintiff erroneously alleges that the first article published by NBC was the article identified as "Exhibit H" to the Complaint. (*See* Doc. 1, Page ID#: 70, ¶ 356; Doc. 1-10 (Compl. Ex. H).) The time stamps for each article show, however, that the AP Report was published before the article Plaintiff described as the "First Article."

(Doc. 1-11, Page ID#: 125-126.) A portion of the last quoted sentence incorporated a hyperlink to a YouTube video posted by "KC Noland," which showed nearly four minutes of interaction between Phillips and a large group of students laughing and chanting, gradually giving way to his direct stand-off with Sandmann.[3] The article noted a discrepancy between the account of Chase Iron Eyes, identified as "a spokesman for the Indigenous Peoples March and an attorney for the Lakota People's Law Project," who "said Phillips was swarmed though some video posted on social media seems to show Phillips walking into the crowd of students." (*Id.* at Page ID#: 127 (emphasis added).)

NBCUniversal's next publication was an article posted on the nbcnews.com website at 6:18 p.m. on January 19 entitled "Catholic school to investigate taunting of Native Americans".[4] (*See* Doc. 1-12 (Compl., Ex. J), Page ID#: 133.) The article noted the still-evolving facts surrounding the incident:

> A Catholic diocese outside Cincinnati is investigating the actions of some of its high school students during the Indigenous Peoples March in Washington on Friday.
>
> Some students wearing Make America Great Again hats and clothing appeared to surround and may have taunted a Native American troupe as it performed the "American Indian Movement" song about strength and courage. It's not clear which of those young people surrounding the Native Americans are students of Covington Catholic High School in Covington, Kentucky. There appears to have been jeering by another group of people preceding the incident recorded on video.
>
>  . . .  In social media videos of the incident Phillips can be seen singing as a male taunts him smilingly and gets close to his face.
>
> The male was not identified.

---

[3] The original article with the embedded hyperlink to the "KC Noland" video is available at https://www.nbcwashington.com/news/local/Kentucky-Diocese-Investigates-After-Students-Mock-Native-Americans-Indigenous-Peoples-March-DC-504597712.html. The link appears through the text in the article: "Videos circulating online."

[4] The "Third Article" is an expanded version of the "First Article." (*Compare* Doc. 1-10 (Compl., Ex. H) *and* Doc. 1-12 (Compl., Ex. J).) Both were published after the AP Article.

. . .

During the incident, some young people appeared to surround the Native Americans and others started to jump and chant. . .[5]

The first on-air NBCUniversal news report was broadcast on the NBC Washington station on January 19, during the local evening news. (Doc. 1 (Compl.) at Page ID#: 29, ¶ 169 (the "First Broadcast").) The report nowhere referenced Sandmann by name. (*Id.* at Page ID#: 29-32.) As a video excerpt aired on screen showing Sandmann smiling and several of his classmates behind him, the report stated: "This video blowing up on social media and sparking outrage across the country, a Native American elder taunted by teens wearing MAGA hats, they mocked him on the steps of the Lincoln Memorial during an Indigenous Peoples March."[6] (*Id.* at Page ID#: 31, ¶ 178(e).) The station reporter then recounted an interview with Nathan Phillips and reported Phillips's subjective feelings of fear during the encounter and his hope for something positive to come out of it:

REPORTER: He told me he was frightened when he was surrounded by those teens.

PHILLIPS: I was scared. I was afeared.

PHILLIPS: Can this be a turning point? Can this be a point of where hatred is stopped?

(*See* Doc. 1 (Compl.), Page ID#: 31, ¶ 178(f), (i), (k).) One of Phillips's supporters stated her view of the incident: "'To have him disrespected like that and to have him harassed on that level, it's awful." (*Id.* at Page ID#: 32, ¶ 178(l).) The report added:

The Diocese of Covington and Covington Catholic High School issued a statement that says in part, "We condemn the actions of the Covington Catholic High School students ... The matter is being investigated and we will take appropriate action, up to and including expulsion."

---

[5] The nbcnews.com article was updated the following day, Sunday, January 20, 2019, at 12:10 p.m. with material relating to an interview with Nathan Phillips that morning on MSNBC.

[6] NBCUniversal has submitted to the Court with its Motion to Dismiss a DVD marked as Exhibit B, which contains each broadcast identified in Plaintiff's complaint, along with the video embedded in the "Second Article."

(*Id.* at Page ID#: 32, ¶ 179.)

NBC News also aired a brief report on the incident on the evening of January 19 during the "Weekend Nightly News" national news broadcast. (Doc. 1 (Compl.), Page ID#: 32, ¶ 181 (the "Second Broadcast").) The report similarly focused on the viral reaction to the apparent conduct of a large group of students, without any reference to Sandmann:

> It was meant to be a time for indigenous people to be seen and heard. But this viral video taken during Friday's rally in Washington has sparked outrage and confusion. The video appears to show dozens of youths wearing Make America Great Again hats, mocking native American elder and Vietnam veteran Nathan Phillips. Many jeering and others looking on.

(Ex. B to Motion to Dismiss, "Second Broadcast.") The report similarly excerpted Phillips's statement about what he heard and felt during the incident: "I was there singing and I heard them say, 'Build that wall, build that wall,' you know. This is indigenous lands. Not supposed to have walls here. We never did for millenniums." (*Id.*) The report concluded by noting several times that there were still aspects of the story that remained "unclear":

> Some of the youths may be from Covington Catholic, an all-male high school in Kentucky. Although it's not clear if everyone in the crowd was from the school. The diocese of Covington saying in a statement, 'The matter is being investigated and we will take appropriate action, up to and including expulsion.'  It's unclear how the event started.  Tonight some wondering how this peaceful rally became a sad display of disrespect.

(*Id.*)

Starting on Sunday, January 20, a series of programs on MSNBC, a cable news network owned by NBCUniversal, addressed the incident. As illustrated by the MSNBC videos incorporated in the Complaint, the general format of MSNBC's programs consists of host anchors discussing events of the day with "contributors" and other commentators or guests, usually in a roundtable setting, a format that bears all the hallmarks of a forum for expression of opinion. On January 20, the MSNBC programs cited in the Complaint were:

6

- "AM Joy" – hosted by Joy Reid, who conducted a live interview with Nathan Phillips. (Doc. 1 (Compl.), Page ID#: 34, ¶ 194 (the "Third Broadcast").)

- "Live with Kendis Gibson" – hosted by Mr. Gibson, with guests Danielle Moodie-Mills, a host of a Sirius XM program; Noah Rothman, an editor at *Commentary* magazine. Basile Smikle, former Executive Director of the New York State Democratic Party, and Katie Phang, an MSNBC Legal contributor. (*Id.* at Page ID#: 38, ¶ 208 (the "Fourth Broadcast").)

- "Kasie DC" – guest-hosted by NBC correspondent Peter Alexander, with guests Senator James Lankford, Michael Steele, Former Chairman of the Republican National Committee, Sam Stein, Politics Editor for the Daily Beast, and Marc Morial, President and CEO of the National Urban League. (*Id.* at Page ID#: 41, ¶ 220 (the "Fifth Broadcast").)

On her program, Ms. Reid quizzed Mr. Phillips on his choice of actions and perceptions during the incident:

> REID:  You can see in - at one point you walk between these two groups of people, the group of African-Americans and the students. . . . why did you choose to walk up to the students?

> PHILLIPS: Well, um, first when I was there -- there was a group. It didn't just happen like that. That was a build-up of about two hours of back and forth between the Black Israelites and the, um, the students. . . . First they came, there, there was about six of them. They went away. They came back with about 20. They went away, they came back  with about  60. They  surrounded  these  black kids,  these  black  guys. And taunting them, and doing, you know, back and forth , racial taunts back and forth. We were just at the sidelines watching this. And so, this is about an hour. Then they went away. That 60. When they came back, 100, maybe 200 of them.  And then they were just a big mob. just ugly, ugly mob.

> REID: When, when you wound up in this conversation, this has now gone viral – this you facing off with this one young man and there were other students doing what sounded like, you know,  faux Native American chants around you. What were you feeling in that moment? What did, what did you think was happening? What did you think their goal was in facing you?

> PHILLIPS:  … When I seen what was happening right at the end, and where it was getting to, there was just like it needed that one little spark and that mob would

have descended on those four guys and ripped them apart. That's what it looked like, that's what it felt like. So when I started singing our songs our prayers to god. That drum is an instrument we use to communicate to God…. I'm praying, God, we are at our indigenous people's march, we want to end this in a good way. But look at my America. Look at my white and black brothers over here, they're tearing at each other.

(Doc. 1 (Compl.), Page ID#: 34, ¶ 194.)

On the other two January 20 MSNBC programs, the hosts and guests engaged in spontaneous dialogue and an exchange of views about the January 18 incident, among other topics, tying the incident into the larger themes of the Dr. Martin Luther King Jr. national holiday. (Doc. 1 (Compl.) Page ID#: 38-45, ¶¶ 208, 220.)

Late in the day on January 20, Sandmann and his parents issued a lengthy written statement identifying him as the person in the videos and offering his own factual account and perspective on the incident (the "Sandmann Statement"). (*Id.* at Page ID#: 20, ¶ 107; Doc. 1-6 (Compl. Ex. D).) The Sandmann Statement was reported, among many other places, in an Associated Press article allegedly edited by NBCUniversal staff and published on the websites of its owned television stations. (Doc. 1-13 (Compl., Ex. K), Page ID#: 137-140.)  The article reported:

A Native American who was seen in online video being taunted outside the Lincoln Memorial said Sunday he felt compelled to get between two groups with his ceremonial drum to defuse a confrontation.

Nathan Phillips said in an interview with The Associated Press that he was trying to keep peace between some Kentucky high school students and a black religious group that was also on the National Mall on Friday. . .

. . .

Videos show a youth standing very close to Phillips and staring at him as he sang and played the drum. Other students — some in "Make America Great Again" hats and sweatshirts — were chanting, laughing and jeering.

Other videos also showed members of the religious group, who appear to be affiliated with the Black Hebrew Israelite movement, yelling disparaging and profane insults at

8

the students, who taunt them in return. Video also shows the Native Americans being insulted by the small religious group as well.

In a statement, Nick Sandmann, a junior at Covington Catholic High School, identified himself as the student in the video and disputed Phillips' description of events. "I would caution everyone passing judgement based on a few seconds of video to watch the longer video clips that are on the internet, as they show a much different story than is being portrayed by people with agendas," he said.

. . .

In his statement, Sandmann said he did not hear any of his schoolmates chanting anything other than school spirit chants. "I did not witness or hear any students chant 'build that wall' or anything hateful or racist at any time. Assertions to the contrary are simply false. Our chants were loud because we wanted to drown out the hateful comments that were being shouted at us by the protestors," he said.

Marcus Frejo, a member of the Pawnee and Seminole tribes who is also known as Chief Quese Imc, said he had been a part of the march and was among a small group of people remaining after the rally when the boisterous students began chanting slogans such as "Make America Great" and then began doing the haka, a traditional Maori dance. In a phone interview, Frejo told the AP he felt they were mocking the dance.

One 11-minute video of the confrontation shows the Haka dance and students loudly chanting before Phillips and Frejo approached them.

. . .

During the incident, Phillips said he heard people chanting "Build that wall" or yelling, "Go back to the reservation." At one point, he said, he sought to ascend to the Lincoln statue and "pray for our country." Some students backed off, but one student wouldn't let him move, he added.

Although he feared the crowd could turn ugly, Frejo said he was at peace singing despite the scorn. He briefly felt something special happen as they sang.

"They went from mocking us and laughing at us to singing with us. I heard it three times," Frejo said. "That spirit moved through us, that drum, and it slowly started to move through some of those youths."

. . .

Sandmann said in his statement that he has provided his version of events to the Diocese of Covington and stands "ready and willing to cooperate with any investigation they are conducting."

9

*(Id.)*[7]

On Monday, January 21, NBC News continued coverage of the January 18 incident on its morning program "Today," with particular focus on the Sandmann Statement. (Doc. 1 (Compl.), Page ID#: 45, ¶ 234 (the "Sixth Broadcast").) Correspondent Ron Allen began his report as follows:

> Good morning, Craig. Those students were in town for the March for Life, and they've been widely condemned for what many see as racist behavior. Now they're facing possible expulsion from school. But this morning they're pushing back saying there's more than one side to the story.   . . .
> The tribal elder said he had stepped in to diffuse a confrontation between the teens and men identifying as Hebrew Israelites. That group seen in a new video, now deleted from Facebook, hurling insults at the teens.  . . .
> But now the student at the center of the controversy, Nick Sandman is speaking out. In a letter Sandman writes he and his fellow students were verbally attacked first by the Hebrew Israelites and that Philips approached them and that they only started performing school spirit chants after given permission by a chaperone. "I was worried that the situation was getting out of control where adults were attempting to provoke teenagers," Sandman wrote. He added that he smiled because "I wanted him to know that I was not going to become angry, intimidated or be provoked into a larger confrontation." In videos other students can be seen making racist gestures.  . . .
> Sandman says he's been targeted with death threats. The tribal elder says he's not sure whether the student should be expelled, while the investigation continues.

(Ex. B to Motion to Dismiss, "Sixth Broadcast.") After Mr. Allen completed his report, anchor Craig Melvin commented: "So many layers to this story." (*Id.*)

Later that morning, Mr. Allen appeared on the MSNBC program "Live with Hallie Jackson," (Doc. 1 (Compl.), Page ID#: 48, ¶ 249 (the "Seventh Broadcast")) which re-aired his taped "Today" report after an introduction by host Hallie Jackson stressing that "there's more of this story than what you might see initially, right?" (Ex. B to Motion to Dismiss, "Seventh Broadcast.") Following Mr. Allen's report, Ms. Jackson, introduced "one of the organizers of the indigenous peoples march who

---

[7] Parts of the article are cut off in the document attached as Exhibit K (Doc. 1-13). The original is available at https://www.nbcnewyork.com/news/national-international/Native-American-Says-He-Tried-to-Ease-Tensions-at-Mall-504627792.html (last visited July 21, 2019).

was at that event, Tara Houska, a tribal rights attorney," who was asked to "explain to us *from your perspective* what exactly you did or did not see?" (*Id.* (emphasis added)):

> HOUSKA: I was there. . . .  Behind me I saw maybe 100 students who were getting louder and louder and louder all wearing Make America Great Again hats begin to do -- it looked like it was a mock haka – which is a, you know, a Maori tradition, a Maori ceremony. And they seemed like they were getting agitated and then I saw the Black Hebrew Israelites shouting really, really terrible things, and it kind of seemed like the two groups were going back and forth.  I saw the elder that was there, Nathan Phillips, and the people around him, but I didn't realize what would end up happening which was them surrounding him chanting build the wall and a youth standing directly in his face in a very leering, aggressive manner.

> JACKSON:  You had walked away prior to that point happening?

> HOUSKA:  I personally kind of felt unsafe. I could feel the energy in the air change, and I actually had a gentleman who was standing next to me. I was like "could you walk me across? I feel it's time to get out of here."

> JACKSON:  You've seen the videos and you saw that piece that Ron Allen just shared with us with the defense of the student Nick Sandmann who said he did not antagonize Nathan Phillips…

> HOUSKA:  …The elder was trying to diffuse the situation by bringing a prayer song to the -- to what was happening on the ground, and to stand in that manner so close to his face in a clearly mocking – you know -- the smile on his face shows how little respect he had for what he was witnessing.  . . .

> JACKSON:  What would your message be to conservatives for example who look at this video and who look at the other videos around this event and have a different interpretation of what happened?

> HOUSKA:  . . . To the people that are saying back and forth, well, it was this version and I have this angle and -- I was there. and I witnessed something that was very aggressive and something that was very frightening. . . .

(*Id.*)

Mr. Allen's taped report was played again that morning on MSNBC's "Live with Craig Melvin," on which Mr. Melvin also interviewed Chase Iron Eyes. (Doc. 1 (Compl.), Page ID#: 51, ¶ 264 (the "Eighth Broadcast").) That evening on "NBC Nightly News," Mr. Allen filed a new report:

ALLEN: …Kentucky high school students accused of mocking Native American elder Nathan Phillips…who claims his drumming was a gesture of peace... But today, junior Nick Sandmann...at the center of the controversy...is speaking out... He and his classmates...who face possible expulsion from Covington Catholic insist this longer video shows what really happened. The teens say they faced a barrage of verbal abuse from a group calling themselves the Black Hebrew Israelites.  Sandmann claims they got permission from chaperones to respond with "spirit chants to counter the hateful things that were being shouted." Phillips approached...trying, he says, to decrease tension between the two groups.

PHILLIPS: "I intervened and things just escalated from there"

ALLEN: Sandmann claims he "singled me out of for a confrontation."  Adding "I did smile at one point because I wanted him to know that I was not going to become angry, intimidated or be provoked..."   A Kentucky congressman, now backing the students...tweeting: "in the face of racist and homosexual slurs, the young boys refused to reciprocate or disrespect anyone." But Native American advocates say the video speaks for itself...

HOUSKA: "He got caught doing something that is incredibly racist and disrespectful. And now he's backpedaling..."

ALLEN: The school and local diocese have apologized to Phillips, a Vietnam veteran.  As the search for more video and answers, continues.

(Doc. 1 (Compl.), Page ID#: 58, ¶ 278 (the "Ninth Broadcast").)

The following morning, January 22, NBCUniversal broadcast a report from correspondent Gabe Gutierrez on both the "Today Program" and on MSNBC Live with Stephanie Ruhle.[8] Gutierrez's report further described the evolving body of video evidence and conflicting personal accounts concerning the incident:

GUTIERREZ: Many people in this area say that these videos offer  a lesson in not rushing to judgment. And this Kentucky community is now thrust into a politically charged debate that has police here on high alert.  . . . This clip showing student Nick Sandmann face-to-face with Native American veteran Nathan Phillips quickly exploding across social media over the weekend. Many of the students in DC for the March for Life wearing Make America Great Again gear. Some are seen making racist gestures, others jumping around and chanting. A new e-mail from their

_____

[8] Plaintiff refers to the Gutierrez report on both networks as the "Tenth Broadcast." (Doc. 1 (Compl.), Page ID#: 56, ¶¶ 289-290.)

12

principal to parents obtained by NBC affiliate WLWT says the incident is "being fully investigated by an independent third-party investigator." The school and local diocese had previously condemned the kids' action and said they were looking at possible expulsion, but defenders of the students say there was a rush to judgment, a fuller picture later coming into view when more videos emerged.. . . . A student whose parents did not want his face shown says they were using their school chants to drown out insults from men identified as Hebrew Israelites.

[BLACK HEBREW ISRAELITE]: This is a bunch of future school shooters. A bunch of babies made out of incest. Like trailer park babies.

GUTIERREZ: One of those men says it all started when the students mocked them. The chants continuing when Phillips entered the picture.

[ANONYMOUS STUDENT]: There was three Native American people there, one of them was jumping up and down, so our guys start jumping up and down, clapping, we're dancing with him. Like I just don't see how we were-- I mean, they were just going along with what they thought was fun.

GUTIERREZ: Nick Sandmann, the student who appears to smirk while standing in front of Phillips blasted what he called "outright lies" in a statement, writing in part, "I believe that by remaining motionless and calm I was helping to diffuse the situation. It was clear to me that he had singled me out for a confrontation, although I'm not sure why," adding a "chaperone gave them permission to perform the school chants." Phillips' account has been interpreted differently. On Saturday he told The Washington Post, "He felt threatened by the teens and that they swarmed around him." When he tried to leave, "…the guy in the hat wouldn't let him retreat." But he's also told the Detroit Free Press that he decided to intervene between the students and the other group, calling it the moment he put himself "…between beast and prey." He now says Sandmann should have accepted responsibility for his actions and should face consequences.

PHILLIPS: Instead of being expelled, the student should go through some kind of sensitivity training, that -- they should --cultural education of some kind, and if they don't, then don't graduate.

(Ex. B to Motion to Dismiss, "Tenth Broadcast.")

Later that morning, Craig Melvin continued the coverage on his MSNBC program, hosting a

discussion with guests Matt Welch of Reason Magazine and Karine Jean Pierre of MoveOn.org.

(Doc. 1 (Compl.), Page ID#: 58, ¶ 302 (the "Eleventh Broadcast").) As Mr. Welch noted,

commenting with exasperation regarding the national conversation about this incident:

> WELCH:  We've lost our damn fool minds. We're in day four of parsing the smirk of a teenager. Can we just, like,  reflect on that for a second? . . . We are freaking out over what was at first a one minute kind of deceptively presented video, and now people are spending their Martin Luther King weekends going through three hours of footage rather than rereading the Letter from the Birmingham Jail over this.  We're losing our minds.

(Ex. B to Motion to Dismiss, "Eleventh Broadcast.")

Mr. Melvin then played an excerpt of his interview with Chase Iron Eyes from the day

before, which he described as "painting a different picture of what happened":

> IRON EYES: All you have to do is watch the video.  And you'll see them doing what's known as the tomahawk chop…. We know what we're talking about. We know what we saw.  And it doesn't matter how people spin it. Our elder felt threatened there.

(*Id.*)

Mr. Melvin then asked Ms. Jean Pierre to comment on that account, and in particular on the

"video showing the kids doing the tomahawk chop":

> JEAN-PIERRE: … Look, this is not an isolated incident, and unfortunately . . .we will continue to see more of these types of incidents, and I'll tell you right now why - it's because of Donald Trump, his tweets, his rhetoric, his behavior. Look, racism and bigotry absolutely existed before Donald Trump, but what he has done is, he has allowed people, especially his base, the people who support him, to feel that they are emboldened and they can do these types of things in public. . . . Let's not forget Charlottesville - Charlottesville where a young woman was murdered by a neo-Nazi. ... Dr. Martin Luther King would not want us to be quiet on any of this. And I believe the organizers.  I believe the elders….

(*Id.*)

Also on January 22, Mr. Sandmann sat for an exclusive interview with Savannah Guthrie of

the "Today" program. (Doc. 1 (Compl.), Page ID#: 62, ¶ 323.) Although the interview did not air on

"Today" until the following morning, portions of it, along with an excerpt from an interview of

another unidentified student, were included in a "NBC Nightly News" report by Gabe Gutierrez on the evening of January 22 that is among the news reports challenged in the Complaint (*Id.* at Page ID#: 61, ¶ 315 (the "Twelfth Broadcast")):

> GUTIERREZ:  Nick Sandmann, the Kentucky student at the center of that viral video, says he wasn't disrespectful when he appeared to confront Native American veteran, Nathan Phillips. He sat down exclusively with today's Savannah Guthrie.
>
> GUTHRIE:  "Do you feel that that you owe anybody an apology? Do you see your own fault in any way?"
>
> SANDMANN:  "As far as standing there, I had every right to do so. …My position is that I was not disrespectful to Mr. Phillips. I respect him. I'd like to talk to him. I mean, in hindsight, I wish we could have walked away and avoided the whole thing".
> . .
>
> GUTIERREZ: A student whose parents didn't want his face shown told NBC affiliate WLWT his classmates were using their school chants approved by chaperones to drown out insults from another group of protestors men identified as Black Hebrew Israelites  But the chants continued when Phillips entered the picture, saying he was trying to intervene.

(Ex. B to Motion to Dismiss, "Twelfth Broadcast.")

On the morning of January 23, "Today" aired a report on NBC that included longer portions of Ms. Guthrie's interview of Mr. Sandmann. (Doc. 1 (Compl.), Page ID#: 62, ¶ 323.)

On his MSNBC program later that morning, Mr. Melvin discussed Mr. Sandmann's interview and the larger implications of the controversy with a guest, Professor Eddie Glaude of Princeton University (Doc. 1 (Compl.), Page ID#: 62, ¶ 324 ("the Thirteenth Broadcast")):

> MELVIN: We are in a moment where our country's divides, both politically and culturally, can be captured in a frame of video. And the images in this case of a Kentucky teenager wearing a Make America Great Again hat and a Native American elder beating a drum, cleave our society, driving people to the familiar and, at times, the convenient. We are seeing resounding backlash to this video of Nathan Philips and Nick Sandmann standing with their faces just inches from each other, as crowds surround them shouting.  Reviewing all of the video we have of this incident, we see the moment does not start here.  . . .  What is unclear in the video is who actually started the confrontation.   .  .  .   Even before Savannah's

interview aired, there was a lot of backlash to even hearing that young man's take on what happened.  Are we at a point in our society where we can't even hear out a possible explanation of things?

GLAUDE:  Well, I think we're always going to face people who have their assumptions affirmed by video footage and the like.  Folks who are in their isolated silos . . .

MELVIN: One of the things that the young man did not say in that interview, two very simple words, "I'm sorry."   Had he uttered those words, would that have changed any of this?

GLAUDE:  It would have reflected a little self-awareness on the part of the young man. . . .

MELVIN: I want to talk about a specific detail of the video that's gotten a lot of intention.  The hat that he's wearing - this Make America Great Again hat . . . Sandmann told Savannah he bought the hat that day from a vendor in D.C.  That hat has become symbolic of a lot of things in this country.  To some, it is merely a hat that dons a political slogan that the President has popularized.  For others, it has become an invitation for confrontation.  Some have even referred to the hat as a modern day version of the Confederate battle flag.  Do we think that the same reaction would have been had on both sides if he weren't wearing that hat?

GLAUDE:  Probably not. there was a sense in which the hat announced a certain set of political commitments.  Alyssa Milano, I think, the actress, describes the hat as a modern day white sheet. . . . Yes, I think if the hats weren't involved, it might not have been as intense.  But there were also words.  . . .

(Ex. B to Motion to Dismiss, "Thirteenth Broadcast.")

On the January 24 broadcast of "Today," Ms. Guthrie interviewed Nathan Phillips, primarily

seeking his reactions to her interview of Mr. Sandmann broadcast the day before (Doc. 1 (Compl.),

Page ID#: 64, ¶ 333 ("the Fourteenth Broadcast")):

GUTHRIE: And--what was your reaction to it? How did it make you feel? What did you think about his words and his explanation and his version of this encounter?

PHILLIPS: Coached and written up for him, insincerity, lack of responsibility. You know, those are the words I came up with. And but then I went to go pray about it. And I woke up-- woke up with this forgiving heart. So I forgive him.

GUTHRIE: He said, when I asked directly, that he didn't think he owed an apology. But he does wish that he had walked away. Was that enough for you, or do you think he should have apologized?

PHILLIPS: Well, there's an apology. There'd be an apology for his own behavior to a lot of other people besides me. I'd be, like, way down on the list of his people he needs to apologize to. But because of the Tomahawk chop and the mocking, and the, those things. And in one of his statements, he did say that he was the leader of that. He got permission from his school teachers. So, you know, it's-- there's-- there's a lot of times he could have walked away.

. . .

GUTHRIE: I asked the young man this question. I'll ask you the same thing. Do you think, in that confrontation, that encounter that went on and on. Should you have walked away? He's-- he said, yes, he thinks now he should have walked away. Do you think, sir, you should have walked away?

PHILLIPS: That's what I was trying to do. I was trying to walk away. There is a spot, there's a place where I could take my people because we were surrounded. We couldn't go right. We couldn't go left, back, you know. And then that I was still in prayer, still singing. And then I was looking past the crowd. And I took that first step, and that crowd backed up. I took a second step, and the crowd started scattering or-- or breaking apart there. And I took a third part. And I actually seen a clear space. I said, that's the space. And we started going that way. And from somewhere, this, from a clear space, a person was there.

GUTHRIE: You feel you were blocked?

PHILLIPS: Oh, I was blocked.

(Ex. B to Motion to Dismiss, "Fourteenth Broadcast.")

On January 27, Joy Reid discussed the incident on her MSNBC program "AM Joy," with guests Dallas Goldtooth of the Indigenous Environmental Network, Jonathan Capehart, a Washington Post columnist, and E.J. Dionne of The Brookings Institution. (Doc. 1 (Compl.), Page ID#: 67, ¶ 343 (the "Fifteenth Broadcast").) They discussed the media coverage over the prior week and the backlash against Nathan Phillips:

GOLDTOOTH: I think that . . . it's absurd but it's not surprising to see right-wing media to try to flip the switch to make it seem as though Nathan Phillips was the aggressor in this situation and to really absolve the youth and their behavior, and

particular the chaperones and their lack of involvement to control their youth and the ugly displays of mockery and racism that they displayed on that day.

REID: …You did see a certain evolution, even in some mainstream media, of the coverage, that reversed the situation to make Nathan Phillips sound like he was the aggressor, like he went after the young man, um, the teenager, Sandmann.

. . .

What do you make of the fact that this has become an issue between a Catholic Diocese which sent students to be political actors at the March for Life, to make a political statement with their presence, but who are now saying but they're just kids and – we- and apologizing to them?"

DIONNE: Well actually I think when you look around the media, there are a lot of very different reactions from Catholics to all of this. There were a lot of Catholics, I think, who were particularly disturbed by the disrespect showed to the Native American elder.

(Ex. B to Motion to Dismiss, "Fifteenth Broadcast.")

This factual recitation demonstrates that NBCUniversal at all times engaged in responsible journalism in an effort to investigate and explain a matter of intense, albeit brief, public interest. The balanced presentation of reactions and perceptions of participants and observers was a necessary and valuable part of the reporting.

## B.    <u>Procedural History</u>.

Sandmann's Complaint against NBCUniversal seeks $275,000,000 in damages, $200,000,000 of that sum being punitive damages. (Doc. 1 (Compl.), Page ID#: 91.) Sandmann's sole cause of action is for defamation, based on fifteen television broadcasts, six online news articles, and three "tweets" posted to Twitter.com linking to other publications. (*Id.*, Page ID#: 29-83.) Sandmann thus asserts, in essence, 24 counts of defamation. NBCUniversal moves for dismissal of all 24 counts pursuant to Fed. R. Civ. P. 12(b)(6), as Sandmann has failed to plead a valid cause of action for defamation.

**IV.    ARGUMENT.**

This case is not about falsity. It is about a difference of opinion and perception. It is perfectly appropriate for the respective sides to debate the issue. But a libel suit in a federal court is not the appropriate method.

Sandmann identifies approximately 166 statements he alleges are "false and defamatory." The number is approximate, because the three "tweets" Sandmann identifies as actionable merely link to two online articles and the "Seventh Broadcast," on which Sandmann bases independent causes of action. Also, several of the allegations refer back to statements made in prior broadcasts. Moreover, many of the statements are identical, or nearly identical to one another, although they appear in different publications.[9]

**A.    Standard of Review.**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Smith v. Tipton Cty. Bd. of Educ.*, 916 F.3d 548, 552 (6th Cir. 2019) (internal quotations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft*, 556 U.S. at 679 (internal quotations omitted). And although the court must accept as true all of the allegations contained in a complaint, this rule is inapplicable to legal conclusions. *Id.* at 678. Moreover, "it is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or

---

[9] To facilitate this Court's review, NBCUniversal attaches a chart assigning numbers to statements Sandmann alleges are false and defamatory for purposes of his defamation claim as **Exhibit A**. NBCUniversal has assigned substantively identical statements the same number to facilitate the Court's review, and indicated where the statements appear in the Complaint by paragraph number. NBCUniversal refers to the statements by where they appear on the chart or by specific paragraph number, as appropriate.

19

that the defendants have violated . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors v. Cal. State Counsel of Carpenters*, 459 U.S. 519, 526 (1983).

Here, Plaintiff has referenced or incorporated by attachment all of the allegedly defamatory television broadcasts, online articles, and tweets into his Complaint. As such, they form part of the pleadings and may be considered in deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) without converting it to a motion for summary judgment. *See Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir. 1999). *See also Hazime v. Fox TV Stations, Inc*., No. 12-15072, 2013 U.S. Dist. LEXIS 116909, at **3-4 (E.D. Mich. Aug. 19, 2013) (holding that Court could consider two television broadcasts for purposes of motion to dismiss defamation claim based on those broadcasts). And when a written instrument or other exhibit to a complaint contradicts allegations in a complaint, the exhibit trumps the allegations. *See Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012) ("if a factual assertion in the pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document" (internal quotations omitted)).

> **B.     Elements of Defamation.**

To state a claim for defamation under Kentucky law, a plaintiff must prove four elements: "(a) a false and defamatory statement concerning [the plaintiff]; (b) an unprivileged publication to a third party; (c) fault amounting to at least negligence on the part of the publisher; and (d) actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2015) (original formatting altered). "'Defamatory language' is broadly construed as language that 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons

from associating or dealing with him.'" *Ball v. E.W. Scripps Co.,* 801 S.W.2d 684, 688 (Ky. 1990) (quoting Restatement (Second) of Torts, § 563) (internal quotations omitted).

Plaintiff does not plead in his complaint that he suffered any special damages as a result of the allegedly false and defamatory statements identified in his Complaint. He does not allege injury beyond public embarrassment, humiliation, and unspecified "perpetual harm to his reputation." (Doc. 1, at Page ID#: 90, ¶¶ 457-468.) *See Dermody v. Presbyterian Church, U.S.A.*, 530 S.W.3d 467, 475 (Ky. Ct. App. 2017) (holding that plaintiff did not plead special damages in complaint "but sought damages generally only for public embarrassment and humiliation and adverse effects on his future employment prospects and career, and for the adverse effect on his future earnings and financial stability" (internal quotations omitted)). Thus, Plaintiff has pleaded only a cause of action for libel per se.

Whether a cause of action for libel is actionable per se is a matter of law. *See Columbia Sussex Corp. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981) (citing *Shields v. Booles*, 38 S.W.2d 677 (Ky. 1931)). To be libelous per se under Kentucky law, the statement must be "false and tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame . . ." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2004), *overruled in part by, Toler*, 458 S.W.3d at 287. "In determining whether a writing or publication is libelous per se, it must be stripped of all innuendo, colloquium, and explanatory circumstances, and, when so construed, it must be defamatory on its face, within the four corners thereof." *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 384 (Ky. 1933).

## C.   Statements that are not of and concerning Sandmann cannot support a cause of action for defamation.

For a plaintiff to sue on an allegedly defamatory statement, the statement must be "of and concerning" the plaintiff. "When the defamatory statement does not name the defamed person, that

person must prove that the article refers to himself." *E. W. Scripps Co. v. Cholmondelay*, 569 S.W.2d 700, 702 (Ky. Ct. App. 1978). As this Court noted in the Washington Post Order, statements "made against an aggregate body of persons" will not support an action by an indidivudal member. (Washington Post Order, at *14 (citing *Louisville Times v. Stivers*, 68 S.W.2d 411, 412 (Ky. 1934).) Furthermore, the Kentucky Supreme Court has held that "[t]o defame a class, the statement must be applicable to every member of the class, and if the words used contain no reflection upon any particular individual, no averment can make them defamatory." *Kentucky Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978). "And as the size of the class increases it becomes more and more difficult for one to show that he was the one at whom the statement was directed." *Id.*

Numerous statements alleged to be "false and defamatory" refer generally to the group of Covington Catholic students—of which Sandmann was a part—as "students," "teens," or "young people," without referencing or reflecting on Sandmann specifically. Statements Nos. 1-17, 19-20, 22, 26, 31, 37, 40, 42, 43-45, and 47, fall into this category.

For instance, Sandmann points to the statement that "the students surrounded the significantly smaller group [of Black Hebrew Israelites], as participants of the Indigenous People's March watched on the sideline." (Doc. 1 (Compl.), Doc. ID#: 76, ¶ 383(f).) Nothing in this statement, nor in the Taitano Video showing Sandmann's interaction with Phillips, nor in any other video, suggests that Sandmann was part of any group of students who "surrounded" the Black Hebrew Israelites. Indeed, none of the videos show Sandmann anywhere in the vicinity of the Black Hebrew Israelites. As such, Sandmann cannot base a libel claim on this statement by virtue of mere membership in the class to which this behavior was attributed. Indeed, in one such challenged statement, Chase Iron Eyes specifically describes the "MAGA-swag-hat-wearing kids" as

"numbering between 60 and 100." (Doc. 1 (Compl.), Page ID#: 52, ¶ 274(e).) This is simply too large a group for a recipient of the statement to assume that statements about interactions with the Black Hebrew Israelites reflected specifically on Sandmann.

Likewise, Sandmann alleges that the statement that "[w]e saw footage later on of the . . . young men cat-calling at young women walking by" defamed him. (Doc. 1 (Compl.), Page ID#: 63, ¶ 330(e).) But once again, nothing in that statement, or in the Taitano Video, remotely suggests that Sandmann was one of the "young men cat-calling," and thus, this statement cannot support a cause of action for defamation.

Moreover, many of the challenged statements do not even reference the larger class of Covington Catholic students. For instance, Sandmann pleads that the statement that "[w]e do have the FBI data that shows hate crimes are on the rise" somehow defamed Sandmann. (Doc. 1 (Compl.), Page ID#: 40, ¶ 214(d).) This statement makes no reference to the class, much less Sandmann individually. Instead, Sandmann's theory would appear to be that a reference to "hate crimes" in the same broadcast as the Taitano Video would allow a reasonable recipient of that statement to conclude it referred not only to the class of Covington Catholic students, but to Sandmann specifically. That leap is implausible, and it cannot be justified by the statement itself or the surrounding circumstances of the broadcast.

### D.   Statements that constitute pure opinion are not actionable as a matter of law.

Under Kentucky law, a statement constituting "pure opinion" is not actionable as a matter of law. The Kentucky Supreme Court has adopted the test for distinguishing fact from opinion set forth in the Restatement (Second) of Torts, which provides: "'A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of an undisclosed defamatory fact as the basis for the opinion.'" *Yancey v. Hamilton*,

23

786 S.W.2d 854, 857 (Ky. 1989) (quoting Restatement (Second) of Torts § 566 (1977)). "Pure opinion, which is absolutely privileged, occurs where the commenter states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is clearly based." *Yancey*, 786 S.W.2d at 857.

> 1. <u>Statements characterizing the conduct depicted on the Taitano Video constitute pure opinion, as NBCUniversal disclosed the facts on which they were based by showing or linking to the Taitano Video.</u>

As an initial matter, the Taitano Video shown during the broadcasts, and linked to in the online articles, is not in and of itself actionable. Sandmann does not allege that NBCUniversal or anyone else altered the Video to depict conduct that did not occur. Thus, as the Taitano Video does not convey any "false" facts, NBCUniversal cannot be held liable for publishing it. *Cf. McCabe v. Vill. Voice, Inc.*, 550 F. Supp. 525, 528 (E.D. Pa. 1982) (holding that still photograph could not be libelous standing alone). Sandmann's claims are thus based on the statements made about the images of Sandmann depicted in the Taitano Video.

The statements about the Taitano Video on which Sandmann relies as a basis for his defamation claims are statements by NBC and MSNBC reporters, and individuals appearing on those networks as guests, characterizing the conduct of the Covington Catholic High School teens depicted in that Video. As Sandmann concedes in his Complaint, NBCUniversal either played the Taitano Video during the broadcasts, or linked to it in the online articles, which Sandmann claims to be defamatory. Thus, NBCUniversal disclosed the facts on which the allegedly defamatory statements characterizing the conduct in the Taitano Video were based. Statements Nos. 1, 7-8, 10-12, 14-18, 24, 26-31, 37, 39-41 and 43, fall within this category.

For example, Sandmann alleges that the statement "Native American Elder Harassed in Viral Video" was false and defamatory. (*See, e.g.*, Doc. 1 (Compl.), Page ID#: 29, 30, ¶¶ 167, 178(a).)

Sandmann contends that he (and the other Covington Catholic students) did not "harass" Phillips, and thus, this statement is verifiably false.

But the facts giving rise to the characterization that Phillips was "harassed" are fully disclosed in the Taitano Video itself. The statement specifically refers to the "Viral Video" as the basis for the use of the term "harassed." Whether the images contained in the Taitano Video can be fairly characterized as depicting harassment is purely a matter of opinion limited to the conduct displayed in that Video. Moreover, those watching the broadcasts—or reading the online articles—had the "exclusive facts" available to them to decide for themselves whether Sandmann "harassed" Phillips. *See Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 882 (E.D. Ky. 2006) (holding that ex-wife's allegation in book that her ex-husband was an "adulterer," which was libelous per se, nevertheless constituted a nonactionable statement of pure opinion because the ex-wife had disclosed all of the facts on which she had based her conclusion," and thus, "[the] reader [was] in as good a position as the author to judge whether the conclusion she reached . . . was correct").[10] The same is true for statements that characterize the conduct shown in the Video with the terms "harassing," "mock," "mocking," "taunt," "taunting," "taunted," "jeered," "disrespect," "disrespectful," "confrontation," "reprehensible," "inappropriate," "inexcusable," "privilege," and "controversial." (*See* Ex. A, Chart, Statements Nos. 1, 5, 7, 18, 19, 27-28, 43.)

In the Washington Post Order, this Court reached an identical conclusion. It noted that such terms are "examples of 'loose, figurative,' 'rhetorical hyperbole' that is protected by the First Amendment because it is not 'susceptible of being proved true or false.'" (Washington Post Order,

---

[10] See also *Loftus v. Nazari*, 21 F. Supp. 3d 849, 854 (E.D. Ky. 2014), where the court held that a statement accusing a plastic surgeon of malpractice was non-actionable opinion because the defendant disclosed the facts upon which she based the statement the plaintiff alleged was defamatory.  The court also ruled that proffered testimony establishing that the doctor did not commit malpractice was irrelevant.

at \*16 (citing *Milkovich v. Lorain-Journal Co.*, 497 U.S. 1, 17, 21 (1990); *Seaton v. Trip Advisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013)).)

Likewise, statements that characterize the conduct in the Taitano Video as "racist," "racist behavior," or a "hate crime," are nonactionable statements of opinion. (*See* Ex. A, Chart, Statements Nos. 8, 14, 24) As with other statements characterizing the teens' conduct, NBC disclosed the facts on which the opinions were based. *See Lassiter*, 456 F. Supp. 2d at 882 (holding that despite fact that allegation of adultery was libelous per se, disclosure of facts on which it was based made the statement nonactionable opinion).

Courts have routinely held that, as a general rule, referring to someone as racist or bigoted constitutes nonactionable opinion. *Squitieri v. Piedmont Airlines, Inc.*, No. 317CV441, 2018 U.S. Dist. LEXIS 25485, at \*\*12-14 (W.D.N.C. Feb. 16, 2018) (collecting cases).

Similarly, the Intermediate Court of Appeals of Hawaii rejected a defamation claim based on the allegation that the defendants had called the plaintiff a racist because they had disclosed the facts on which they based their opinion. *Williams v. Kanemaru*, 309 P.3d 972 (Haw. Ct. App. 2013). In that case, the basis for the defendants' statement that the plaintiff was a "racist" were the disclosed facts that plaintiff said she "did not like Barack Obama and said that he looks like a 'bobble head' and because she made fun of a colleague's manner of speech." *Id.* In rejecting the claim, the court explained that "[b]ecause the basis for the opinion was disclosed, if the opinion were deemed unfounded or unfair, the listener would be free to reject it." *Id.*

Sandmann does not allege (and cannot prove) that those watching the broadcasts, or reading the online articles, would have drawn the "reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts." *Yancey*, 786

S.W.2d at 857 (internal quotations omitted and emphasis added). Indeed, his complaint concedes that the video formed the basis of the stated opinions.

Sandmann's theory of liability is based on the argument that views about his conduct would have differed had they been based on other videos of the incident. For example, with respect to the Fifteenth Broadcast, Sandmann alleges that "MSNBC once again failed to broadcast any portion of the longer, more accurate video that exposes Phillips's lies—instead MSNBC continued to replay the short clips from the Taitano Video that had already been called out several days earlier on NBCUniversal as being 'deceptively-presented.'" (Doc. 1 (Compl.) Page ID#: 70, ¶ 352.) In other words, the thrust of Sandmann's theory of liability is that NBCUniversal should not have published opinions about the conduct depicted in the Taitano Video because other videos depicting other conduct may have changed those opinions.

But Sandmann's assertion that other videos may have changed opinions about how to characterize the conduct depicted in the Taitano Video is nothing more than pure speculation. Moreover, whether conduct shown in other videos from the same incident would have changed hearts and minds about how to characterize the conduct shown in the Taitano Video is wholly irrelevant.[11] The First Amendment does not permit a court or jury to police whether an opinion is based on sufficient factual information, so long as the publisher discloses all of the facts on which the opinion is based. *See Lassiter*, 456 F. Supp. 2d at 882. As the U.S. Supreme Court observed over forty years ago,

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

---

[11] *See Machleder v. Diaz*, 801 F.2d 46, 55 (2d Cir. 1986), where the court held that falsity (for purposes of a false light claim) "may not be predicated on a rule that holds a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts which might have cast the Plaintiff in a more favorable or balanced light."

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). It is simply not possible for the Court or jury to decide that an opinion characterizing the expression on Sandmann's face, or his failure to move out of Phillips's way, as "mocking" or "disrespectful," was false. That some people may have differing opinions about the Covington Catholic teens' conduct depicted in the various videos posted online, or simply characterized the conduct differently based on their subjective impressions of what they saw, does not compel a different conclusion.

> 2.  NBCUniversal is not liable for publishing or republishing Phillips's and other eyewitnesses' statements regarding their subjective perceptions about the incident, as such statements constitute pure opinion.

Sandmann alleges that statements made by Phillips, Howland, Houska, and Chase Iron Eyes about their subjective feelings or perception of the incident were false and defamatory, and bases his claims on NBCUniversal's publication or republication of those statements. Statements Nos. 2, 4, 5, 13, 19, 21-25, 32-36, and 42-48, fall into this category. Because of their prominence in the Complaint, we focus here primarily on Phillips's statements, but the following analysis applies with equal force to the challenged statements of the other eyewitnesses.

For example, Phillips's statements that he was "scared" and "afeared," and that he felt "threatened by the teens" during the incident, (*See* Ex. A, Chart, Statements No. 2, 22, 33), are expressions of Phillips's subjective opinion about what he felt during the encounter. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.) ("if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable"). Similarly, Houska's statement that she "witnessed something that was very aggressive and something that was very frightening," and Iron Eyes' observations that Phillips was "swarmed" and that "our elder felt

threatened there," are their subjective views of what they perceived and experienced. (Doc. 1 (Compl.), Page ID#: 49, ¶ 258(g).)

NBC's publication of Phillips's statements that he believed he was "blocked" during his face-to-face encounter with Sandmann does not give rise to a claim for defamation for several reasons. First, those statements constitute nothing more than interpretation, conjecture or surmise, which are not actionable. (*See* Ex. A, Chart, Statement No. 35.) Since the Taitano Video makes clear that Phillips was not affirmatively rebuffed from advancing further up the Lincoln Memorial steps, a reasonable viewer would necessarily conclude that Phillips was simply speculating as to Sandmann's intentions, and did not actually know what Sandmann would have done had Phillips attempted to push past or go around him, or push his way out of the group. Put another way, Phillips's characterization of Sandmann's stance as "block[ing]" was simply a subjective interpretation of the physical dynamic of his encounter with Sandmann, and therefore clear opinion.

As the Washington Post Order noted with respect to Phillips's "blocking" comment, "[t]here were no undisclosed facts, and the reader was in as good a position as Phillips to judge whether the conclusion he reached—that he was blocked—was correct." (Washington Post Order, at *18.)

Second, Phillips's description of being "blocked" in the context of the NBCUniversal's reporting is substantially true. The only NBC broadcast reporting that Phillips was "blocked" came in the "Fourteenth Broadcast." That broadcast is Savannah Guthrie's interview with Nathan Phillips himself. At the 5:40 mark, while describing the January 19 events, Phillips says as he was proceeding up the Lincoln Memorial steps he encountered Sandmann directly in front of him, and at that moment felt "blocked." That statement is borne out by the video evidence and is substantially true. Sandmann confirmed the truth of this statement in his interview with Savannah Guthrie, when he asserted that he "had every right" to stand in Mr. Phillips's path. (Doc. 1 (Compl.), Page ID#: 62,

29

¶ 323.) Sandmann essentially admitted not only that he blocked Mr. Phillips, but that he believed he had a legal right to do so.

Moreover, Sandmann's asserted belief that he had every right to remain in Phillips's way also constitutes an admission that the "blocking" description of the interaction is not defamatory. If one exercises a legal right, that conduct cannot lower one's reputation. Thus, even assuming Phillips's innocuous statement of his subjective perception were somehow "provably false," it is not defamatory.

Finally, Phillips's statements speculating on what might have occurred between the Covington Catholic students and the Black Hebrew Israelites had he not inserted himself into the mix, are likewise nothing more than unverifiable conjecture or surmise. (See Doc. 1 (Compl.), Page ID#: 35, ¶ 204(g), (h), (i).) Phillips stated that "when I seen what was happening right at the end, and where it was getting to, there was just like it needed that one little spark and that mob would have descended on those four guys and ripped them apart. That's what it looked like, that's what it felt like." (*Id.* at ¶ 204(h).) Phillips did not, of course, know what would have happened had he not walked between the two groups, and no reasonable recipient of that statement would understand Phillips to be claiming knowledge about events that never occurred. Similarly, Phillips's statement that he "intervened and things just escalated from there" is mere interpretation of the events that followed his decision to walk into the group of teens, but does not suggest he claimed knowledge of undisclosed verifiably false facts. (*Id.* at Page ID#: 76, ¶ 382(c).)

3.    NBCUniversal is not liable for republishing the Diocese of Covington's, Covington Catholic High School's, or the Mayor of Covington's statements condemning the incident, as such statements constitute pure opinion.

Sandmann alleges that NBCUniversal's republication of statements made by the Diocese of Covington, Covington Catholic High School and the Mayor of Covington criticizing the actions of the students were "false and defamatory." Statements Nos. 6, 17, 20, and 23 fall into this category.

With respect to the Mayor's statement, putting aside the fact that he does not refer to Sandmann specifically, it is nonactionable opinion. (Doc. 1 (Compl.), Page ID#: 46, ¶ 244(d), (v).) He is quoted as saying that the students' conduct "represented a behavior and an attitude that certainly does not reflect the values that we here in Covington, Kentucky, have and promote." (*Id.*) Words like "attitude" and "values", and phrases such as "does not reflect", are entirely subjective to the speaker, and not factual in nature.

The Diocese of Covington and Covington Catholics's statements are likewise nonactionable statements of opinion. The first statement reads "We condemn the actions of the Covington Catholic High School students towards Nathan Phillips specifically, and Native Americans in general" (Doc. 1 (Compl.), Page ID#: 35, ¶ 204(d)) and that they "will take appropriate action, up to and including expulsion" (*Id.* at Page ID: 47, ¶ 244(d)(iv).)  But the word "condemn," standing by itself, is nothing more than an expression of disapproving conduct, i.e., pure opinion.[12]

The Diocese of Covington and Covington Catholic's statement that they "will take appropriate action up to and including expulsion" is a statement of future intent, inherently speculative, and not actionable as a matter of law. *WCP/Fern Exposition Servs., LLC v. Hall*, No.

---

[12] Moreover, Plaintiff has no right to relief for the supposed defamatory "gist" that he "violated the fundamental standards of his religious community" and of his Catholic school.  As an initial matter, the Court cannot constitutionally inquire into the tenets of Plaintiff's faith or adjudicate whether he did, in fact, violate the standards of his religious community.  *See Dermody v. Presbyterian Church*, 530 S.W. 3d  467, 474 (holding that the court "cannot" review church's disciplinary determinations in adjudicating a libel claim); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. V. EEOC*, 565 U.S. 171, 185-86 (2012) ("whenever the questions of discipline … have been decided by the highest of the church judicatories … the legal tribunals must accept such decisions as final" (brackets omitted)).

3:08-CV-522, 2011 U.S. Dist. LEXIS 32590, at **38039 (W.D. Ky. Mar. 28, 2011) (holding that "a prediction about a possible future event" could "not be grounded in any fact, much less a defamatory one, and is protected as pure opinion").

### E.      Sandmann bases claims on statements that are not capable of defamatory meaning as a matter of law.

For a statement to be actionable as libel per se, it must "tend to injure one in his reputation or to expose him to public hatred, contempt, scorn, obloquy or shame." *Stringer*, 151 S.W.3d at 795 (internal quotations omitted). "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express." *Ball*, 801 S.W.2d at 688 (internal quotations omitted). "In determining whether a writing or publication is libelous per se, it must be stripped of all innuendo, colloquium, and explanatory circumstances, and, when so construed, it must be defamatory on its face, within the four corners thereof." *Sweeney & Co.*, 60 S.W.2d at 384.

In his Complaint, Sandmann attempts to plead defamation claims based on a number of innocuous statements that are incapable of being ascribed a defamatory meaning by a reasonable listener. Statements Nos. 1-10, 12, 14-16, 18, 27, 32-35, 38, and 45-49, fall into this category.

For example, Sandmann alleges the headline "Confrontation at Lincoln Memorial goes Viral" was false and defamatory. (Doc. 1 (Compl.), Page ID#: 41, ¶ 219.) Even assuming the term "confrontation" could be a false statement of fact, nothing about the statement—on its face—would tend to injure Sandmann or expose him to "public hatred, contempt, scorn, obloquy or shame."

Likewise, statements that the Covington Catholic students chanted "[b]uild the wall" are not capable of defamatory meaning. The policy underlying the "build the wall" chant is the position of the President of the United States, and of a mainstream political party. Thus, to say that someone uttered those words is not defamatory. *See Cox v. Hatch*, 761 P.2d 556 (Utah 1988) ("attribution of

32

membership in a political party in the United States that is a mainstream party and not at odds with the fundamental social order is not defamatory").

**F.    Non-Actionable statements cannot support a claim for "defamation by implication."**

Sandmann also attempts to "gist" his way to a claim based on non-actionable statements. Thus, for example, Sandmann claims that "[t]he First Broadcast conveyed the false and defamatory gist that Nicholas' behavior violated the fundamental standards of his religious community."  (Doc. 1 (Compl.), Page ID#: 30, ¶ 176.). That claim is based on NBCUniversal's reporting on the of the Diocese of Covington's initial statement condemning the actions of the students. Sandmann does not allege, nor could he, that NBCUniversal inaccurately reported what the Diocese said. The reporting on that statement was truthful and omitted no information that would have changed the meaning of the statement itself. In the absence of material omissions or some juxtaposition that leads to a false implication, a true recitation of facts does not give rise to a claim for defamation by implication based on the contention that some reader may reach an unpleasant conclusion about the plaintiff. *See Loricchio v. Evening News Association*, 476 N.W.2d 112, 125-26 (Mich. 1991); *White v. Fraternal Order of Police*, 909 F.2d 512, 525-26 (D.C. Cir. 1990).

Moreover, the Diocese's statement condemning the actions of the students is an expression of its opinion that the students acted inappropriately. Sandmann cannot transform a non-actionable statement of an opinion into a fact by arbitrarily assigning an innuendo to it. And indeed, even the stated gist—whether certain activity comports with an interpretation of religious teachings—is itself a statement of opinion. *See Southern Air Transport, Inc. v. American Broadcasting Companies*, 877 F.2d 1010, 1016-17 (D.C. Cir. 1989).

Similarly, Sandmann cannot take the presentation of undisputed facts, and transform them into something they are not by claiming the "gist" is more than what was plainly presented.

Sandmann contends that "[t]he Second Broadcast conveyed the false and defamatory gist that Nicholas assaulted Phillips." (Doc. 1 (Compl.), Page ID#: 33, ¶ 186). But none of the text from the Second Broadcast in any way indicates that Sandmann "assaulted" Phillips. The Broadcast used the terms "harassing" and "mocking," but those terms do not constitute "assault." Moreover, the Taitano Video that accompanied the Broadcast depicts Sandmann standing in front of Phillips, sporting a grin, but in no way assaulting him.

The alleged gist has to have some relation to the actual broadcast. *See* Restatement (Second) of Torts § 563 (1977). The broadcast in no way stated or implied that Sandmann or any of the students committed or were charged with assault. Thus, even if a viewer somehow concluded that the actions depicted on any of the relevant videos constituted an "assault" that would constitute that viewer's subjective interpretation of the video. *See Southern Air Transport*, 877 F.2d at 1016-17.

As this Court noted in the Washington Post Order, "Sandmann's reasoning is precisely the type of 'explanation' and 'innuendo' that 'cannot enlarge or add to the sense or effect of the words charged to be libelous, or impute to them a meaning not warranted by the words themselves." (Washington Post Order, at *21 (quoting *Dermody*, 530 S.W.3d at 475 (internal quotations omitted).)

While Sandmann provides a rote recitation of "gists" allegedly implied from each broadcast, each one suffers from the same deficiencies identified in the examples above.

**G.     Statements that are substantially true are not actionable.**

Under Kentucky law, a statement is not "false" if it is substantially true. *Bell v. Courier-Journal and Louisville Times Co.*, 402 S.W.2d 84 (Ky. 1966). "Substantial truth" means that a defendant is "not to be held to the exact facts or to the most minute details of the transactions that it

reports." *Id.* at 87. *See also Glogower v. Pulitzer Broad. Co.*, 1996 U.S. App. LEXIS 22564 (6th Cir. Aug. 2, 1996). The United States Supreme Court has ruled in a similar fashion, holding:

> The falsity must be 'material.' . . . [M]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." A statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.

*Air Wis. Airlines Corp. v. Hoeper*, 134 S. Ct. 852 (2014) (internal quotations and original formatting omitted).

Sandmann alleges that a number of statements are "false" but—when compared to the video evidence incorporated into Sandmann's Complaint by reference—they are substantially true, if not completely true. Statements Nos. 2, 11-12, 14-15, 26, 28-29, 33, 35, 42, and 49, fall within this category.[13]

Central to Sandmann's claims is the argument that statements by Phillips and others that the Covington Catholic students surrounded Phillips were false and defamatory, and that those statements were a primary source of Sandmann's reputational injury. (*See* Ex. A, Chart, Statements Nos. 2, 11, 33-35, 49.) But the statement that the students "surrounded" Phillips indeed describes what happened, as depicted in all of the videos incorporated into Sandmann's Complaint by reference showing Phillips walking into the group of teens.

The videos show that when Phillips walked into the group, the students formed at least a semi-circle, if not a complete one, around him. Sandmann contends that the video allegedly shows an opening through which Phillips could have conceivably walked without running into one of the teens. Even if true, adding that fact would not have a materially different effect on the mind of a reader than the term "surrounded," especially where the facts upon which that statement were based were fully disclosed in the aired video segments depicting the conduct at issue.

---

[13] The substantial truth of Phillips's statement that he was blocked is discussed on page 29 of the memorandum in support.

## H.   The three tweets linking to two online articles and the "Seventh Broadcast" do not constitute republication.

Federal district courts have held that the Kentucky Supreme Court, if presented with the question, would adopt the single publication rule. *See*, *e.g.*, *Mitan v. Davis*, 243 F. Supp. 2d 719, 722 (W.D. Ky. 2003) ("We believe that were a Kentucky court to examine this issue today it would adopt the single publication rule."). Under that rule, "any form of mass communication or aggregate publication . . . is a single communication and can give rise to only one action for libel." *Salyer v. Southern Poverty Law Ctr., Inc.,* 701 F. Supp.2d 912 (W.D. Ky. 2009). With respect to republication by hyperlink, the Salyer court explained:

> Traditional republication occurs when the substance of the previously published defamatory statements are altered or the defamatory statements themselves are put forth in a new form. Neither of those methods of republication occurred in this case. The hyperlinks, while adding a new method of access to "A Few Bad Men," did not restate the allegedly defamatory statements and did not alter the substance of that article in any manner.

*Id*. at 918.

Here, Sandmann points to three tweets as false and defamatory. (Doc. 1, Compl. ¶¶ 408-417.) But Sandmann alleges only that the tweets "linked to" other publications, which he claims contained false and defamatory statements. He does not allege that the tweets themselves contained any actionable statements. Accordingly, the tweets cannot constitute republication so as to give rise to new claims, and Sandmann's claims for defamation based on the three tweets fail as a matter of law.

## V.   CONCLUSION.

For the reasons set forth, NBCUniversal respectfully requests that the Court GRANT its Motion, and dismiss Sandmann's Complaint with prejudice.

Respectfully submitted,

/s/Darren W. Ford
John C. Greiner (*Pro Hac Vice*)
GRAYDON HEAD & RITCHEY LLP
312 Walnut St.
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-2734
Fax: (513) 333-4316
jgreiner@graydon.com

&

J. Stephen Smith (KBA #86612)
Darren W. Ford (KBA #95373)
GRAYDON HEAD & RITCHEY LLP
2400 Chamber Center Drive
Suite 300
Ft. Mitchell, KY 41017
Phone: (859) 578-3070
Fax: (859) 578-3071
ssmith@graydon.com
dford@graydon.com

ATTORNEYS FOR DEFENDANT

9646905.3