**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

| | | |
|---|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO. 2:19-cv-00056-WOB-CJS** |
| | : | |
| | : | **JUDGE WILLIAM O. BERTELSMAN** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **(ORAL ARGUMENT REQUESTED)** |
| | : | |
| **NBCUNIVERSAL MEDIA, LLC,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |
| | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................................................ i

**PROCEDURAL HISTORY** ............................................................................................ 4

**FACTUAL BACKGROUND** ......................................................................................... 4

   I.   Nicholas Was a Victim, Not an Aggressor, During the January 18 Incident. ................. 5

   II.   The Viral Video Is Misleading and Incomplete.................................................................. 6

   III.  Phillips Was a Biased and Unreliable Witness with a False Factual Narrative.............. 8

   IV.  Nicholas Was a Victim of NBCUniversal's Negligent Reporting................................... 9

      A.   NBCUniversal's First and Second Broadcasts and First and Second Articles Were False and Defamatory. .................................................................................... 9

      B.   NBCUniversal's Third Broadcast and Third Article Were False and Defamatory. ... 10

      C.   NBCUniversal's Fourth Broadcast and Fourth Article Were False and Defamatory. 11

      D.   NBCUniversal's Fifth and Sixth Broadcasts and Fifth and Sixth Articles Were False and Defamatory....................................................................................................... 12

      E.   NBCUniversal's Seventh, Eighth, Ninth, and Tenth Broadcasts Were False and Defamatory. .......................................................................................................... 13

      F.   NBCUniversal's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Broadcasts Were False and Defamatory....................................................................................... 14

      G.   NBCUniversal's Tweets Were False and Defamatory. ............................................. 15

**ARGUMENT** ................................................................................................................. 16

   I.   Legal Standards to Be Applied ..................................................................................... 16

      A.   All Allegations of the Complaint Must Be Taken as True. ....................................... 16

      B.   "Of and Concerning" Is a Jury Issue if There Is Any Ambiguity.............................. 17

      C.   Defamatory Meaning Is a Jury Issue if There Is Any Ambiguity.............................. 17

      D.   Identifying Opinion Requires Review of Entire Context. ......................................... 18

      E.   Truth or Falsity Is Generally a Jury Issue.................................................................. 19

II.   NBCUniversal's Publications Are "Of and Concerning" Nicholas. ............................. 20

   A.   The Group Libel Doctrine Is Inapplicable. ................................................ 21

   B.   Nicholas Was Specifically Identified in Each of NBCUniversal's Publications ........ 21

III.   NBCUniversal's Accusations Are Capable of a Defamatory Meaning. ........................ 26

   A.   The Context Establishes that the Accusations Are Defamatory. ............................... 28

   B.   Accusations that Nicholas Committed an Assault and Hate Crime Are Defamatory
        *Per Se*. ................................................................................................... 29

   C.   NBCUniversal's Accusations that Nicholas Committed Racist Misconduct Are
        Defamatory Per Se and Capable of a Defamatory Meaning. ..................................... 32

IV.   NBCUniversal's Accusations Against Nicholas Are Not Protected Opinion. .............. 33

   A.   Phillips' Accusations Conveyed a False Factual Narrative. ....................................... 34

   B.   NBCUniversal's Accusations Against Nicholas Were Factual. ................................ 36

   C.   The Disclosed Factual Bases Were Incorrect and Incomplete. .................................. 39

   D.   NBCUniversal Implied the Existence of Undisclosed, Defamatory Facts. ................ 43

   V.   Defamation by Implication. ........................................................................... 44

**CONCLUSION** .................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582 (W.D.N.C. 2013) ................................... 16

*Armstrong v. Shirvell*, 596 F. App'x 433 (6th Cir. 2015) ............................................................. 37

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ............................................................................ 4, 16

*Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732 (Ky. Ct. App. 2004) .......................... 27

*Boyles v. Mid-Florida Television Corp.*, 431 So. 2d 627, 634-35 (Fla. Dist. Ct. App. 1983),
    *app'd*, 467 So. 2d 282 (Fla. 1985) .................................................................................... 32, 37

*Cheney v. Dailey News L.P.*, 654 Fed. App'x 578 (3d Cir. 2016) ................................................ 25

*Clark v. American Broadcasting Cos., Inc.*, 684 F.2d 1208 (6th Cir. 1982) .............................. 25

*Clark v. Viacom Int'l Inc.*, 617 Fed. App'x 495 (6th Cir. 2015) ................................................. 19

*Cromity v. Meiners*, 494 S.W.3d 499 (Ky. Ct. App. 2015) ...................................... 18, 33, 39, 40

*Desai v. Charter Commc'ns, LLC*, 2018 WL 297599, at *4 (W.D. Ky. Jan. 4, 2018).......... 17, 26

*E.W. Scripps Co. v. Cholmondelay*, 569 S.W.2d 700 (Ky. Ct. App. 1978)................................. 20

*Fortney v. Guzman*, 482 S.W.3d 784 (Ky. Ct. App. 2015)........................................................... 32

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) ...................................................................... 16

*Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302 (Ky. 2010). ....................................................... 16

*Holmes v. Curtis Publ'g Co.*, 303 F. Supp. 522 (D.S.C. 1969) .................................................. 25

*Jackson v. Consumer Publ'ns*, 11 N.Y.S.2d 462 (App. Div. 1939) ........................................... 25

*Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785 (Ky. 2005) ............................. 19

*Lasky v. American Broad. Cos.,* 631. F. Supp. 962 (S.D.N.Y. 1986)........................................... 27

*Lassiter v. Lassiter*, 456 F. Supp. 2d 876 (E.D. Ky. 2006)................................................... 29, 39

*Louisville Times v. Stivers*, 68 S.W.2d 411 (Ky. Ct. App. 1934) ................................................ 20

i

*Marcum v. G.L.A. Collection Co.*, 646 F. Supp. 2d 870 (E.D. Ky 2008) ..................................... 19

*Marr v. Putnam*, 246 P.2d 509 (Ore. 1952). ....................................................................... 17

*McCall v. Courier-Journal & Louisville Times Co.,* 623 S.W.2d 882 (Ky. 1981)....... 5, 16, 26, 31

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)................................................ 18, 33, 34, 39

*Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868 (S.D.N.Y. 1984) .............................. 32

*Nappier v. Jefferson Standard Life Ins. Co.*, 322 F.2d 502 (4th Cir. 1963) ................................. 24

*Nichols v. Moore*, 477 F.3d 396 (6th Cir. 2007)........................................................................ 44

*O'Brien v. Williamson Daily News*, 735 F. Supp. 218 (E.D. Ky. 1990), *aff'd*, 931 F.2d 893 (6th Cir. 1991).............................................................................................................................. 17

*Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248 (2010) .................................................. 37

*Peck v. Tribune Co.*, 214 U.S. 185 (1909).................................................................................. 23

*Pennington v. Dollar Tree Stores, Inc.*, 28 Fed. App'x 482 (6th Cir. 2002) ............................... 29

*Robinson v. United States*, 506 A.2d 572 (D.C. 1986) ........................................................ 30, 36

*Smith v. United States*, 593 A.2d 205 (D.C. 1991) ................................................................... 30

*Stanton v. Metro Corp.*, 438 F.3d 119 (1st Cir. 2006)............................................................... 23

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014).................................................... 19, 27

*Toikka v. Jones*, 2013 WL 978926, at *3 (E.D. Ky. Mar. 12, 2013) ........................................ 32

*Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014).......................................................... 19, 29

*Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383, 386-87 (8th Cir. 1996) ........................................................................................................................................ 44

*U.S. v. Allen*, 341 F.3d 870, 876-77 (9th Cir. 2003) ................................................................. 31

*Wallace v. Media News Grp., Inc.*, 568 Fed. App'x 121 (3d Cir. 2014) ...................................... 24

*Welch v. American Publ'g Co.*, 3 S.W.3d 724 (Ky. 1999) .......................................................... 40

*Williams v. Blackwell*, 487 S.W.3d 451, 454 (Ky. Ct. App. 2016)............................................. 40

*Yancey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989).............................................................. 18, 34, 39

## CONSTITUTIONS AND STATUTES

Ky. Const. § 8 ................................................................................................................... 16

18 U.S.C. § 245 (b)(2)(B) ................................................................................................. 31

D.C. CODE § 22-404 (2013) ............................................................................................. 30

## OTHER AUTHORITIES

RESTATEMENT (SECOND) OF TORTS § 564A ................................................................... 21

RESTATEMENT (SECOND) OF TORTS § 565.................................................................... 26, 31

RESTATEMENT (SECOND) OF TORTS § 569 ................................................................... 31

RESTATEMENT (SECOND) OF TORTS § 614 ............................................................... 17, 26

RESTATEMENT (SECOND) OF TORTS § 617 ............................................................... 17, 19

## INTRODUCTION

In a transparent attempt to fit this case into the Court's July 26, 2019 order in the Washington Post case (currently under reconsideration by the Court),[1] NBCUniversal Media, LLC ("NBCUniversal") claims in its motion to dismiss that "[t]his case is not about falsity" but is about "a difference of opinion." To the contrary, the core of this case is falsity – the false factual narrative of the talemaker, activist Nathan Phillips ("Phillips), which was negligently republished by the talebearer, NBCUniversal. NBCUniversal's coverage was not "balanced" and was not about "a difference of opinion." NBCUniversal's coverage was a false smear campaign under the guise of "news" against a 16-year-old boy who was falsely portrayed to the public as the poster child for racist misconduct. The gist of its coverage conveniently and intentionally fit perfectly into the political agendas being advanced by NBCUniversal and Phillips. The factual narrative was false – Nicholas never moved or uttered a word. The gist conveyed by the false narrative viewed in context was false – Nicholas did not engage in any racist misconduct, and he was not an instigator of a "hate crime" against the Native American and his group of minority activists.

NBCUniversal's effort to pigeonhole this case into a perceived opening arising from language in the order dismissing Nicholas' original complaint against the Washington Post,[2] misses the target. First, as this Court is well aware, Nicholas has filed a motion for reconsideration of the dismissal in the Post litigation and for leave to file an amended complaint, and many of the arguments in support of those motions apply to the arguments asserted by NBCUniversal in its motion to dismiss. Second, NBCUniversal's coverage in many instances significantly differs from the Post's coverage. Each of Nicholas' pending cases[3] must be adjudicated separately and must be considered in the varying contexts in which the false and defamatory statements and gists were

---

[1] *Sandmann v. WP Company, LLC*, Case No. 2:19-cv-00019-WOB-CJS (the "Post Litigation").

[2] Along with Plaintiff's motion for reconsideration, a motion for leave to file an amended complaint is currently under consideration by the Court. *See* Post Litigation at Doc. 57.

[3] In addition to this case and the Post Litigation, Nicholas' third pending case is styled *Sandmann v. Cable News Network, Inc.*, Case No. 2:19-cv-00031-WOB-CJS.

presented to the public. This case, like Nicholas' other pending cases, should be considered only after the development of a full factual record through discovery.

NBCUniversal published seemingly endless broadcasts, online articles, and tweets that were woven together across NBCUniversal's immensely broad media network to convey the false accusation that Nicholas participated in racially motivated misconduct that constituted a "hate crime" against both a Native American elder and an African-American religious group at the Lincoln Memorial in Washington, D.C. on the weekend of Martin Luther King Jr. Day in 2019 (the "January 18 incident"). NBCUniversal's coverage blanketed the Internet, social media, and air waves through NBCUniversal's many websites, social media accounts, and television and cable stations across the country. NBCUniversal used the January 18 incident as a springboard to broadcast programs and publish articles criticizing President Donald Trump and denouncing the racial tensions in our country. To do so, NBCUniversal falsely made Nicholas the poster child for "white privilege" racist misconduct resulting from the racial tension in our country.

However, NBCUniversal's entire premise was false and inaccurate, because it was based on the false factual narrative of an untruthful and unreliable witness and a misleading, edited 1-minute snippet of video provided by an accomplice of that unreliable "factual" witness. NBCUniversal knew or reasonably should have known that Phillips' factual narrative was false, but it steadfastly refused to admit the truth to its readers. Nicholas' claims against NBCUniversal are not based on the fact that NBCUniversal failed to show *all available* video or failed to present *only* Nicholas' side of the story – Nicholas' claims against NBCUniversal arise from the fact that NBCUniversal falsely represented to its viewers and readers that Phillips was a trustworthy and reliable witness despite compelling evidence that he was a liar. NBCUniversal falsely conveyed to its viewers and readers that Nicholas had committed a "hate crime" despite the undisputed video record proving that Nicholas did absolutely nothing except to stand still after Phillips targeted Nicholas and confronted him, banging a drum in his face. NBCUniversal knew or reasonably should have known that there was video evidence available that demonstrated unequivocally that

2

Phillips was lying, but NBCUniversal nevertheless falsely informed its viewers and readers that it had reviewed all available video and that the Viral Video presented an accurate and complete picture of the January 18 incident, confirming the factual description by Phillips. In fact, even as individuals on NBCUniversal's later broadcasts discussed the longer videos that had been available since immediately after the January 18 incident, NBCUniversal replayed the Viral Video on a loop for its viewers, falsely conveying that the speaker was describing the Viral Video instead of a longer videos that actually showed Phillips targeting, approaching, and confronting Nicholas.

NBCUniversal used Phillips' false factual narrative to create its own banner storyline about hate crimes and racial tensions, using Nicholas as the punching bag for numerous "news" reports and panel discussions.  The Viral Video was played over and over by NBCUniversal so that Nicholas' face was constantly on the screen during NBCUniversal's broadcasts regarding hate crimes and racial tensions.  While that fact was clear from the allegations of Nicholas' original Complaint, it receives additional support from the allegations in the First Amended Complaint. NBCUniversal clung to and continued to peddle Phillips' false factual narrative to support its own agenda as late as January 27, 2019 – long after the false narrative, as well as Phillips, had been thoroughly discredited.

Nicholas has alleged in his First Amended Complaint that Phillips was not conveying his opinion but instead was purporting to convey a factual narrative of what had actually occurred.  If there was any doubt about who Phillips was accusing, NBCUniversal made those accusations of and concerning Nicholas. NBCUniversal and other media outlets did not interview Phillips seeking his *opinion* of what he thought had occurred – they interviewed him to get his factual recitation of the events.  NBCUniversal did not broadcast hours of commentators and purported authorities on racial issues to discuss Phillips' *opinion* of what occurred on January 18 – they were discussing the false factual narrative presented by Phillips.

There is no disagreement with the principle of defamation law that the issue of whether the statements claimed by Nicholas to be false and defamatory must be considered in context.  When

3

so viewed, Nicholas' First Amended Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Under the facts alleged by Nicholas – which must be accepted as true – it is plausible that NBCUniversal negligently republished the false factual narrative of Phillips in a context that rendered the statements capable of a defamatory meaning. The "sting" conveyed by an untruthful source with his own agenda and republished in NBCUniversal's numerous broadcasts and articles was that Nicholas had engaged in racial misconduct and in doing so, was guilty of a hate crime.

Whether Phillips was stating opinions or facts in interviews republished by NBCUniversal is, at a minimum, a jury issue. Under the allegations of Nicholas' amended complaint, a jury could readily decide that Phillips was making statements of fact. But no determination of that issue can be properly undertaken on a pre-trial motion without consideration of Phillips' deposition and the full factual record of all relevant circumstances developed through discovery.  NBCUniversal's motion to dismiss must be denied.

## PROCEDURAL HISTORY

On May 1, 2019, Nicholas filed his original Complaint against NBCUniversal. (Doc. 1). On July 29, 2019, NBCUniversal filed a Motion to Dismiss the original Complaint under Rule 12(b)(6).  (Doc. 21).  On August 19, 2019, Nicholas filed his First Amended Complaint ("Amended Complaint" or "Am. Compl.") pursuant to Rule 15. (Doc. 23).  On September 16, 2019, NBCUniversal filed a Motion to Dismiss the Amended Complaint. (Doc. 29).  On October 2, 2019, this Court issued an Order Denying NBCUniversal's First Motion to Dismiss (Doc. 21) as Moot. (Doc. 32). Nicholas submits this Response in Opposition to NBCUniversal's Motion to Dismiss the First Amended Complaint (Doc. 29-1).

## FACTUAL BACKGROUND

From other pending cases, this Court is generally familiar with the incident at the Lincoln Memorial in Washington D.C. on January 18, 2019 (the "January 18 incident"). Thus, Nicholas

will highlight the facts that are relevant to NBCUniversal's broadcasts, articles, and tweets,[4] and the pertinent Viral Video[5] which fully explain and describe NBCUniversal's false and defamatory attacks on an innocent 16-year old student.

## I.      Nicholas Was a Victim, Not an Aggressor, During the January 18 Incident.

On January 18, 2019, Nicholas attended the March for Life ("March") on a high school field trip with his Covington Catholic High School ("CovCath") classmates. (Am. Compl. ¶ 64). While waiting on the steps of the Lincoln Memorial for buses that would take Nicholas and the students home to Kentucky, members of a religious extremist group—the Black Hebrew Israelites—began shouting racist profanities and insults toward Nicholas and the students, as well as a multitude of bystanders, including Native Americans. (*Id.* ¶¶ 65-67). Nicholas and the students, per their chaperone's instructions, continued waiting for their buses on the stairs of the Lincoln Memorial while the Black Hebrew Israelites directed abusive, homophobic, and racist remarks towards them for nearly an hour. (*Id.* ¶¶ 46, 103(a)). One of Nicholas' classmates asked a school chaperone for permission to organize a school spirit cheer to drown out the hateful speech being hurled at them, and the chaperone agreed. (*Id.* ¶ 68).

Thereafter, Nathan Phillips approached Nicholas and the students from afar while the students were still standing on the stairs of the Lincoln Memorial. (*Id.* ¶ 69). Phillips walked

---

[4] The broadcasts, articles, and tweets are collectively referred to herein as the "publications." In its Motion, NBCUniversal refers to isolated "statements" or individual sentences as parsed out in its Exhibit A. This is part of NBCUniversal's strategy to misstate Plaintiff's contentions, and obfuscate, scatter and divide statements and sentences, hoping the Court will be misled into ignoring context. Exhibit A is inaccurate as to Plaintiff's contentions and void of any support or rationale for its legal conclusions. With no context, Exhibit A misrepresents Plaintiff's allegations, and it does not merit consideration. This Court must look at the *gist* created by each article or broadcast in context – not by parsing out individual words or sentences. The Kentucky Supreme Court has instructed that allegedly defamatory articles must be "construed as a whole" and that "[t]he alleged defamatory words must be measured by their natural and probable effect on the mind of the average lay reader…." *McCall v. Courier-Journal & Louisville Times Co.,* 623 S.W.2d 882, 884 (Ky. 1981).

[5] The selectively edited 1-minute portion of the Taitano Video is referred to herein as the "Viral Video." (*See* Am. Compl. ¶ 102).

through the crowd to find Nicholas.  (*Id.* ¶ 69).  Phillips instigated the confrontation with Nicholas.  (*Id.*).  Phillips, by his own volition, got into Nicholas' face.  (*Id.*).  Not knowing what to do, Nicholas innocently acquiesced in Phillips' confusing course of conduct and stood still.  (*Id.* ¶ 50).  Phillips' comrades followed Phillips into the crowd with cameras to hopefully capture a viral video moment on film, ultimately recording the now-infamous image of the encounter: Nicholas wearing a "MAGA" hat standing still while Phillips beat a drum and sang inches from his face.  (*Id.* ¶ 71).

A portion of the video filmed by one of Phillips' comrades, Kaya Taitano, became the Viral Video,[6] which had a misleading cover image erroneously depicting Nicholas as the aggressor who was purportedly responsible for igniting a racist confrontation.  (*Id.* ¶¶ 28-29, 33-36, 42-44, 100, 205, 208, 247, 263, 276, 287, 293, 297-301, 307, 311, 329, 345, 364, 381, 397, 408, 425, 439, 455, 467, 493, 510, 522, 538, 548, 557, 584).  In fact, Nicholas was startled and confused by the actions of Phillips in singling him out and confronting him.  (*Id.* ¶ 84).  Nicholas attempted only to deescalate the situation that Phillips caused – for example, Nicholas instructed a classmate not to succumb to Phillips' comrade's inflammatory tactics designed to elicit a reaction from the high school students.  (*Id.* ¶¶ 90-91).  Once the buses arrived, the students departed, and the encounter ended.  (*Id.* ¶ 92).  Moments later, one of Phillips' comrades turned to Phillips and celebrated a perceived "victory" over Nicholas and the students, shouting, "I got him man. I got him, man, I got him … we won grandpa, we fucking won grandpa." (*Id.* ¶ 94-96).

## II.     The Viral Video Is Misleading and Incomplete.

It is critical to recognize that the Viral Video was an incorrect, incomplete, and misleading representation of Nicholas' conduct during the January 18 incident.  NBCUniversal emphasizes that Nicholas does not contend that the Viral Video was "altered" in any way, but Nicholas has alleged throughout his First Amended Complaint that the Viral Video was a selectively edited 1-

---

[6] NBCUniversal disingenuously says that "[s]omeone in the crowd" filmed the Viral Video (Mot. at 1 n.1).  NBCUniversal is aware – or certainly should be considering how many times it broadcast it – that the Viral Video was recorded by Kaya Taitano, who was a participant in the Indigenous Peoples March and one of Phillips' activist comrades. (*See* Am. Compl. ¶¶ 102-04).

minute clip of the January 18 incident that did not fairly and accurately portray the events. (Am. Compl. ¶¶ 102, 201). The Viral Video captured only a moment in time – it did not show what happened before or after the clip. Yet, the Viral Video became the cornerstone of NBCUniversal's false reporting, even when NBCUniversal knew or reasonably should have known that it was an incomplete depiction of the encounter because it left viewers with no way to determine whether Phillips' narrative was accurate.[7] (*Id.* ¶¶ 201, 203). The Viral Video was replayed by NBCUniversal over and over during its broadcasts while reporters and commentators were talking, and it was linked to in NBCUniversal's articles, which displayed this cover image of Nicholas standing front-and-center in a red hat:



*A Screenshot of NBCUniversal's Republication of the Viral Video with Kaya Taitano's Instagram Credit in Top Right Corner.*
*This is the infamous "video cover image" of the Viral Video.*

(*Id.* ¶ 201, 457(b)). The Viral Video only portrayed about 1 minute of the January 18 incident, even though the incident was much longer. (*Id.* ¶¶ 102-03). The Viral Video does not portray what happened prior to Phillips standing in front of Nicholas and banging his drum in Nicholas' face, and it does not portray what happened afterwards. Thus, it is impossible to know what

---

[7] In fact, a video known as the "Banyamyan Video" was a live broadcast of the January 18 incident filmed from the perspective of the Black Hebrew Israelites that lasted over ninety minutes and accurately set forth the factual events of what occurred during the January 18 incident. (Am. Compl. ¶¶ 110-12). The Banyamyan Video was available online **before** the Viral Video was available online and accurately set forth the events of the January 18 incident. (*Id.*).

actually occurred based solely on reviewing the Viral Video. Nevertheless, NBCUniversal negligently published and perpetuated the out-of-context Viral Video – and filled in the gaps in the video with Phillips' false factual narrative as to how the incident had started and ended – as the basis for all of its reporting on the January 18 incident. NBCUniversal included, replayed, and showed the cover image from the Viral Video in every one of its publications, and NBCUniversal portrayed the video, together with Phillips' false factual narrative, as accurately depicting the encounter.[8]

### III. Phillips Was a Biased and Unreliable Source Publishing a False Factual Narrative.

Nicholas has alleged in his First Amended Complaint significant facts to support his contention that Phillips was a biased and unreliable witness who was attempting to further his own political agenda by making up out of whole cloth the false factual narrative that NBCUniversal republished again and again.[9] Nicholas also has pled that NBCUniversal knew, or should have known upon reasonable investigation, about Phillips' bias and unreliability.

Nicholas has alleged that Phillips has a history of activism against President Trump – even going so far as to beat his drum on the steps of the Trump International Hotel during a protest in Washington, D.C. less than one year prior to the January 18 incident. (Am. Compl. ¶¶ 147-58). Nicholas has alleged that Phillips protested at a Catholic church in Washington, D.C. the night after the January 18 incident, demanding punishment for Nicholas and his classmates and recompense from the Catholic Church for the "hundred-plus years of genocide that indigenous

---

[8] *See* First Broadcast (Am. Compl. ¶ 240), Second Broadcast (*Id*. ¶ 258), Third Broadcast (*Id*. ¶ 272), Fourth Broadcast (*Id*. ¶ 290), Fifth Broadcast (*Id*. ¶ 304), Sixth Broadcast (*Id*. ¶ 325), Seventh Broadcast (*Id*. ¶ 341), Eighth Broadcast (*Id*. ¶ 360), Ninth Broadcast (*Id*. ¶ 379), Tenth Broadcast (*Id*. ¶ 393), Eleventh Broadcast (*Id*. ¶ 405), Twelfth Broadcast (*Id*. ¶ 421), Thirteenth Broadcast (*Id*. ¶ 436), Fourteenth Broadcast (*Id*. ¶ 452), Fifteenth Broadcast (*Id*. ¶ 464), First Article (*Id*. ¶ 489), Second Article (*Id*. ¶ 503), Third Article (*Id*. ¶ 517), Fourth Article (*Id*. ¶ 528), Fifth Article (*Id*. ¶ 543), Sixth Article (*Id*. ¶ 552).

[9] Indeed, NBCUniversal has moved to strike Nicholas' expanded allegations establishing Phillips' bias and unreliability. A complete discussion of the relevance of those allegations is contained in Nicholas' opposition to NBCUniversal's motion to strike, which is being filed simultaneously herewith.

peoples have endured….." (*Id.* ¶¶ 159-65). Nicholas has alleged that Phillips lied about having served in Vietnam. (*Id.* ¶¶ 166-70). Nicholas has pled that Phillips previously made a very similar claim of "harassment" by a group of white college students. (*Id.* ¶¶ 171-82). Nicholas has alleged facts about Phillips' criminal record, including accusations and bragging admissions of assault. (*Id.* at ¶¶ 183-85). Finally, Nicholas has traced how Phillips' story changed over time as details contradicting Phillips' narrative became more widely available in the media. (*Id.* at ¶¶ 186-98).

## IV.  Nicholas Was a Victim of NBCUniversal's Negligent Reporting.[10]

NBCUniversal relied on Phillips and the Viral Video – and its misleading cover image of Nicholas' face – to support its agenda of using the January 18 incident as a centerpiece of its reporting on racial misconduct and hate crimes. NBCUniversal published at least fifteen (15) defamatory television broadcasts, six (6) defamatory online articles, and many tweets, all of which included false and defamatory statements and gists about Nicholas. (*Id.* ¶ 28).

### A.  NBCUniversal's First and Second Broadcasts and First and Second Articles Were False and Defamatory.

NBCUniversal published its First Broadcast on January 19. The First Broadcast conveyed the false gists that Nicholas was an aggressor who sought out Phillips from afar to ignite a race-motivated, threatening confrontation with Phillips and other Native American activists, and to disrupt a peaceful, Native American prayer ceremony that Phillips was performing with a drum. (Am. Compl. ¶ 237-55). The First Broadcast plays the Viral Video while the tone of voice used by the anchor – in conjunction with the words "harassed," "mocked," and "taunted," and Phillips' statement that he was "scared" and "afeared" when Nicholas "surrounded" him while he was filmed crying – give rise to the unavoidable conclusion that Nicholas and the students approached and targeted Phillips for a conflict based upon racial hatred, amounting to an assault and hate crime. (*Id.* ¶¶ 237-55, 240(f)). The Second Broadcast perpetuated the false and defamatory gists

---

[10] NBCUniversal does not argue that Nicholas is a limited purpose public figure – and for good reason: Nicholas is a quintessential private figure, and NBCUniversal apparently concedes that fact, at least for purposes of this motion. (*See id.* ¶¶ 570-78). Thus, the plausibility of Nicholas' Amended Complaint must be assessed under a negligence standard.

conveyed by the First Broadcast, showed an image of Nicholas' face via the Viral Video, and added language such as "students spark controversy at the Indigenous Peoples March" and that Phillips' was conducting a "special ceremony" with which Nicholas intentionally and threateningly interfered because of Phillips' race. (*Id.* ¶¶ 256-68).

The First Article and Second Article echoed language from the First and Second Broadcasts and their derivative gists. The First Article added language such as Nicholas was "caught on film"[11] harassing Phillips and that he "surrounded" Phillips with a troupe of "chanting, laughing, and jeering" boys. (*Id.* ¶¶ 484-500). The First Article, at the very top of the online version, attached an NBCUniversal-branded copy of the out-of-context Viral Video that, when viewed and played in conjunction with the words used in the article and the tone used by the newscaster, gives rise to the unavoidable conclusion that a factual, provably false event occurred – that Nicholas sought out Phillips from afar, and, in his capacity as purported leader of the student group, instigated a threatening, racial confrontation with Phillips to the point where it caused Phillips, a purported Vietnam Veteran, to cry out of fear for his safety. (*Id.* ¶ 500(d)-(g)). In addition to linking to the Viral Video and its cover image, the Second Article added more language that Nicholas and the students shouted "[b]uild the wall" directed at Phillips, which is a provably false event. (*Id.* ¶¶ 264, 268(f)). NBCUniversal should have known that the Viral Video was merely an out-of-context snapshot of the January 18 incident and should not have published it or have continued to masquerade it as truthful representation of the January 18 incident by republishing it throughout its entire coverage.

**B.    NBCUniversal's Third Broadcast and Third Article Were False and Defamatory.**

The Third Broadcast and Third Article were both published on January 20, and they continued to echo the language and derivative gists published in the preceding publications, and

---

[11] Sensationalized language like "caught on film," in conjunction with accusations of harassment, targeting, mocking, taunting, surrounding, assault, and a hate crime, conveys to a lay reader that the Viral Video was a smoking-gun proving Nicholas' purportedly illegal and immoral conduct.

added language that, when viewed with the Viral Video and heard with the tone of anchor, gave rise to the unavoidable conclusion that, before Nicholas walked up to Phillips in a racially threatening manner, Nicholas, as purported leader of the CovCath group, started a race-motivated, threatening confrontation with the Black Hebrew Israelites because they were African-American. (*Id.* ¶¶ 274, 275-77, 517-21).  The Third Broadcast conspicuously published the Viral Video while commentators spoke over it and used language like "[Nicholas and the students'] attention was on the Black Hebrew Israelites" and "[Nicholas and the students] needed that one little spark and that mob (led by Nicholas via the Viral Video) would have descended on those 4 guys [Black Hebrew Israelites] and ripped them apart" (while showing the Viral Video). (*Id.* ¶¶ 269-87).  The Third Article described the Black Hebrew Israelites as "black kids" or "black guys" and not the factually necessary description of the Black Hebrew Israelites as a recognized hate group of adults.  (*Id.* ¶ 282(g)).  The Third Article specifically identified Phillips' prayer as the "American Indian Movement" song about strength and unity, which adds to the false gist that, when viewed with the Viral Video and in the context of NBCUniversal's entire coverage to this point, Nicholas interfered with a Native American religious ceremony based on his purported racial hatred. (*Id.*).  Both the Third Broadcast and Third Article also republished the Diocese's rushed statement that they "condemned" Nicholas and the students for their purported assault and hate crime, which the Diocese would later retract and apologize for – specifically to Nicholas and his family.  (*Id.* ¶ 135).

### C.   NBCUniversal's Fourth Broadcast and Fourth Article Were False and Defamatory.

The Fourth Broadcast echoed the language used in the preceding publications and added more language that appointed Nicholas as the posterchild of white supremacy and racial tensions in America. (*Id.* ¶¶ 288-301).  The Fourth Broadcast began with a discussion of how hate crimes are "on the rise" in America via an FBI statistic while showing the Viral Video and Nicholas' face via the cover image. (*Id.* ¶ 297(d)).  The juxtaposition of the hate crime statistics, in conjunction with the Viral Video, the tone of the commentators, and preceding coverage, gave rise to the unavoidable conclusion that Nicholas' conducted amounted to an indictable hate crime against

both the Black Hebrew Israelites and Phillips. (*Id.* ¶ 293).  The Fourth Article echoed the language used in the preceding publications and added language to indicate that Nicholas intentionally threatened Phillips by getting into his face and not letting him move to the top of the Lincoln Memorial. The Fourth Article asserted that "[Phillips] sought to ascend to the Lincoln Memorial to 'pray for our country.' Some students backed off, but one student wouldn't let him move." (*Id.* ¶ 541(h)).  The Fourth Article republished the accusation that "these young people were just roughshodding through our space, like what's been going on for 500 years here – just walking through our territories, feeling like 'this is ours.'" (*Id.* ¶ 541(f)).  Nicholas' Amended Complaint specifically alleges as fact that Phillips never had any intention to climb the stairs of the Lincoln Memorial and approached Nicholas only to manufacture a viral video to advance his own activist agenda. (*Id.* ¶¶ 195, 526-41).

### D.   NBCUniversal's Fifth and Sixth Broadcasts and Fifth and Sixth Articles Were False and Defamatory.

The Fifth Broadcast, Sixth Broadcast, Fifth Article, and the Sixth Article all republished the Viral Video and echoed the same language and gists conveyed in the preceding coverage, such as Nicholas initially "surrounded" Phillips and started "harassing" and "taunting" him. (*Id.* ¶¶ 100, 240(f), 282(b), 290(g)).  The Fifth Broadcast published pictures of Nicholas' face during key statements of the broadcast, including when an anchor said that KKK and Nazis were "walking in public," when another anchor said "we have to condemn this," and when NBCUniversal republished the statement that Nicholas' actions are "inconsistent with the teachings of the Church," thereby tying Nicholas specifically to those statements as well as to the broadcast and coverage as a whole.  (*Id.* ¶¶ 302-22).  One commentator during the Fifth Broadcast insinuated that Nicholas' purported conduct amounted to what would have been a "lynching": "[w]e've come a long, long way from the days of dogs, police dogs, and fire hoses and lynchings and those types of things, but ***those activities take different forms today and they manifest themselves differently***" (while juxtaposing the Viral Video containing Nicholas' face).  (*Id.* ¶ 313(i) (emphasis added)). The Sixth Broadcast, among other things, published the subtitle "STUDENT SPEAKS OUT

AFTER TAUNTING CAUGHT ON TAPE," sensationally contending that the Viral Video was a smoking-gun proving as a matter of fact that Nicholas had taunted Phillips.  (*Id.* ¶ 335(a)).

The Fifth and Sixth Articles included the Viral Video and reiterated language used in the preceding publications that, when viewed in context of the Viral Video and NBCUniversal's entire coverage up to that point, conveyed that Nicholas was an aggressor who sought out Phillips from across the Lincoln Memorial platform, got into his face during a peaceful Native American prayer song, and was intentionally threatening by mocking, harassing, and taunting him with his cohorts in a racially threatening manner to a point where Phillips cried out of fear for his safety.  (*Id.* ¶¶ 542-49).  The Fifth Article actually republished Phillips' false accusation that "Sandmann 'was the leader'" of the students who were mocking the Native Americans.  (*Id.* ¶ 549(d)).

### E.   NBCUniversal's Seventh, Eighth, Ninth, and Tenth Broadcasts Were False and Defamatory.

The Seventh Broadcast, among other things, continued to republish the Viral Video and to perpetuate the false and defamatory gist that Nicholas assaulted Phillips by seeking him out from across the Lincoln Memorial and confronted and surrounded him in a threatening manner with a group of  "taunting" teenagers who shouted "build the wall."  (*Id.* ¶ 350).  The Seventh Article identified Nicholas as the "youth" who "surrounded" Phillips in a "leering and aggressive manner" with "antagonism and hate" and who was racially motivated to threaten Phillips because of his Native American heritage. (*Id.*).   The Seventh Article said that Nicholas was faced with the possible threat of expulsion from school for his purported assault. (*Id.*)  The Eighth Broadcast, among other things, continued communicating the false and defamatory gists from NBCUniversal's preceding coverage, broadcasting Nicholas' face via the Viral Video, and said that there was "outrage" over Nicholas' purported actions. (*Id.* ¶ 370).  The Eighth Broadcast republished a statement from Chase Iron Eyes who said, "[Phillips] apprehended, he felt, there was an apprehension of a legitimate and ***objective threat of harm or violence*** or offensive contact." (*Id.* ¶ 370(f) (emphasis added)).  The Eighth Broadcast also misleadingly broadcast the Viral Video showing Nicholas' face while Chase Iron Eyes discussed the Banyamyan Video.  (*Id.* ¶¶ 373-76).

13

The Ninth and Tenth Broadcasts, among other things, perpetuated the false and defamatory gists communicated by the preceding publications and coverage, such as that Phillips was "scared" and "afeared" when Nicholas purportedly confronted him and got into his face constituting an assault and hate crime.  The Ninth Broadcast continued to perpetuate the lie that Phillips was a "Vietnam veteran" after that had been debunked and continued telling its viewers that there was a "search for more video and answers" – even when the Banyamyan Video, among others, was available on January 18 even before the Viral Video was published to the internet and depicted exactly what happened.  (*Id.* ¶ 384-89).  The Tenth Broadcast republished a statement from the Black Hebrew Israelites saying that "[the January 18 incident] started when the students mocked [the Black Hebrew Israelites]."  The Tenth Broadcast republished a statement from Phillips that "he felt threatened by the teens and that they swarmed around him. When he tried to leave, that guy in the hat wouldn't let him retreat."  (*Id.* ¶ 402(c)).

### F.     NBCUniversal's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Broadcasts Were False and Defamatory.

The Eleventh Broadcast, Twelfth Broadcast, Thirteenth Broadcast, Fourteenth Broadcast, and Fifteenth Broadcast all perpetuated the false and defamatory gists that Nicholas committed an assault and hate crime.  Among other things, the Eleventh Broadcast added the assertion that "racism and bigotry absolutely existed before Donald Trump, but what he has done is, he has allowed people, especially his base, people who support him, to feel that they are emboldened and they can do ***these types of things*** in public." (*Id.* ¶ 411(d)) (emphasis added).  Most egregiously, the Eleventh Broadcast drew a comparison of Nicholas' alleged conduct during the January 18 incident to the Charlottesville riots where a young woman was murdered by a neo-Nazi.  (*Id.* ¶ 411(e)).  The commentators in the Eleventh Broadcast portrayed the January 18 incident as a "racial incident" – a provably false event – while a larger-than-life-sized photograph of Nicholas' face loomed in the background.  (*Id.* ¶ 418).  The Thirteenth Broadcast republished a commentary from actress Alyssa Milano that Nicholas' MAGA hat is a "modern day white sheet," alluding to

the Klu Klux Klan, and conveys a "racial animus."  The Thirteenth Broadcast falsely stated that Nicholas and the students were catcalling at young women in an earlier encounter. (*Id.* ¶ 442(e)).

The Fourteenth Broadcast was an interview with Nathan Phillips and republished many false and defamatory gists about Nicholas, including that, he shouted "build the wall" and that his perceived "anger" was directed at the Black Hebrew Israelites.  (*Id.* ¶ 457).  Additionally, Phillips paints the false, grim picture that he was trying to "walk away" to find a safe place where he could find refuge when all of a sudden Nicholas approached him from "a clear space" and blocked his retreat. (*Id.* ¶ 457).  The Fifteenth Broadcast was published on January 27 – nine (9) days after the January 18 incident – but still perpetuated the false and defamatory gists communicated from the date of NBCUniversal's First Broadcast that Nicholas instigated a race-motivated and racially threatening assault and hate crime against Phillips and the Black Hebrew Israelites.  While showing a picture of Nicholas' face via the Viral Video, the Fifteenth Broadcast published the statement that Nicholas' alleged behavior "shows a deeply rooted sense of superiority and privilege that white people feel towards black and brown people, specifically in this case, Indigenous Peoples." (*Id.* ¶ 473(a)).  Additionally, a speaker during the Fifteenth Broadcast admitted that "[t]here were a lot of Catholics … who were particularly disturbed by the disrespect showed to the Native American elder."  (*Id.* ¶ 473(d)).  Still, even nine days later, NBCUniversal failed to broadcast the longer videos, including the Banyamyan Video, and remained completely reliant on the Viral Video even after it had admitted its incorrect and incomplete nature. (*Id.* ¶ 474-75).

### G.    NBCUniversal's Tweets Were False and Defamatory.

NBCUniversal's numerous tweets linked to various portions of its false and defamatory broadcasts and articles.  (*Id.* ¶ 560).  The First Tweet linked to an online article and stated false and defamatory statements from the Sixth Broadcast that "many see" Nicholas' purported conduct as "racist behavior." (*Id.* ¶¶ 561-62).  The Second Tweet linked to an online article that contained portions of the false and defamatory Viral Video. (*Id.* ¶¶ 563-64). The Third Tweet included a picture of Nicholas' face from the cover image of the Viral Video and republished a quote from

Phillips that Nicholas' behavior was "aggressive" and "something that was very frightening." (*Id.* ¶¶ 565-66).

## ARGUMENT

Kentucky's Constitution recognizes a "fundamental right of private individuals to be free from being defamed," mandating that "'[e]very person may freely speak, write and print on any subject, *being responsible for the abuse of that liberty*.'" *McCall,* 623 S.W.2d at 886 (quoting Ky. Const. § 8) (emphasis added). The Supreme Court of Kentucky has recognized that "some categories of speech are undeserving of any constitutional protection at all, including false, defamatory speech." *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 312 (Ky. 2010). There is no constitutional value in false statements of fact. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974). Neither the intentional lie nor the careless error materially advances society's interest in uninhibited, robust, and wide-open debate on public issues. *Id*. (internal citations omitted).

## I.    Legal Standards to Be Applied

### A.    All Allegations of the Complaint Must Be Taken as True.

NBCUniversal overlooks the breadth and detail of Nicholas' factual allegations, which are required at this stage of the litigation to establish a facial plausible cause of action. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Facial plausibility exists when the factual allegations allow a court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.* The plausibility standard applies to each of the elements of defamation individually. *See, e.g., Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582, 596-97 (W.D.N.C. 2013) (rejecting group libel defense and holding that plaintiff's identity was "plausibly 'ascertainable'" where she was not named or described in the article but a photograph in the article of over one hundred individuals highlighted her in particular).

16

### B.   "Of and Concerning" Is a Jury Issue if There Is Any Ambiguity.

Nicholas was literally and figuratively the face of NBCUniversal's reporting.[12]  In each of

NBCUniversal's broadcasts, articles, and tweets, Nicholas was singled out from his group as a

consequence of the Viral Video, which displayed a picture of his face in the cover image and

through descriptive circumstances that distinguished him from the balance of the student group.

The "of and concerning" inquiry is a question of law only when "there is no ambiguity in the

language used in connection with all the attendant circumstances." *Marr v. Putnam*, 246 P.2d 509,

515 (Ore. 1952).  If, after examining the libelous publication as a whole and in context, there exists

any ambiguity as to whether the libel is "of and concerning" the plaintiff, the question must go to

the jury.  *See, e.g.*, RESTATEMENT (SECOND) OF TORTS ("RESTATEMENT") § 617 cmt. a ("[W]hether

[publication] was of and concerning the plaintiff [is] ordinarily for the jury or trier of fact to

determine."); *O'Brien v. Williamson Daily News*, 735 F. Supp. 218, 223-24 (E.D. Ky. 1990), *aff'd*,

931 F.2d 893 (6th Cir. 1991) (analyzing the "article as a whole" and finding that the "ultimate

conclusion on the reasonableness of the allegedly libelous interpretation must lie with the finder

of fact").

### C.   Defamatory Meaning Is a Jury Issue if There Is Any Ambiguity.

NBCUniversal inappropriately argues that this Court should hold that its publications did

not convey a defamatory meaning, (Mot. at 35), and in doing so fails to recognize a critical

distinction between the roles of judge and jury in defamation cases.  The judge must decide as a

matter of law whether the challenged statements, in the context of the whole article, were *capable*

of bearing a defamatory meaning.  *See, e.g.*, RESTATEMENT § 614; *Desai v. Charter Commc'ns,*

*LLC*, 2018 WL 297599, at *4 (W.D. Ky. Jan. 4, 2018).  Once a statement is determined to be

capable of bearing a defamatory meaning, the court's inquiry ends, and it is for the jury to

determine "whether a defamatory meaning was attributed to it by those who received the

---

[12] NBCUniversal admitted on January 27 via its reporter Joy Reid that Nicholas Sandmann was "the teen who became the face of the [January 18 incident]."  (Am. Compl. ¶ 101). NBCUniversal also republished Phillips' false accusation that Nicholas was "the leader of" the student group purportedly mocking the Indigenous Peoples. (*Id.* ¶549(d)).

communication." *Desai*, 2018 WL 297599, at *4 (citing *Yancey v. Hamilton*, 786 S.W.2d 854, 858-59 (Ky. 1989)).  If the challenged statements are capable of more than one meaning, one defamatory and the other non-defamatory, "the jury should decide which of the meanings a recipient of the message would attribute to it."  *Yancey*, 786 S.W.2d at 858 (citations omitted).

### D.  Identifying Opinion Requires Review of Entire Context.

In determining whether a statement is protected opinion, the fundamental question is whether the defendant's false statement can be proven true or false.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 27 (1990); *accord Cromity v. Meiners*, 494 S.W.3d 499, 503 (Ky. Ct. App. 2015) (noting that that the United States Supreme Court in *Milkovich* "took a position consistent with the Kentucky Supreme Court's approach in *Yancey*").  In *Milkovich*, the United States Supreme Court explained that:

> If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, *if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact*.  Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'

*Milkovich*, 497 U.S. at 18 (emphasis added).

An opinion that a person engaged in conduct—such as perjury, assault, harassment, taunting, or mocking—speaks of objectively verifiable events and is thus actionable if its basis is undisclosed, false, or incomplete. When determining if an opinion is actionable, a court examines the "whole context" of a publication.  *Yancey*, 786 S.W.2d at 857.

Under the circumstances of this case, the accusations identified by Nicholas are false statements of fact.  Nicholas has alleged, and the evidence supports, that Phillips was presenting a purported factual narrative of events when he made accusations such as that Nicholas "blocked" him.  Nicholas has alleged, and the evidence supports, that NBCUniversal was presenting a purported factual presentation of the "news" when it advised its viewers, for example, that Nicholas had been "caught on tape" "taunting" Phillips or "caught on film" "harassing" Phillips.

18

Although these words or phrases could be deemed opinion in a different case, in the context within which they were made in this case, they were purporting to provide – and a reasonable viewer would have interpreted them as providing – factual narrative.

### E.   Truth or Falsity Is Generally a Jury Issue.

Finally, NBCUniversal urges this Court to dismiss the Amended Complaint because it contends that certain of its accusations are "substantially true." (Mot. at 38). The doctrine of substantial truth applies "in very narrow and limited circumstances and relates only to incidental information and not to essential content." *Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785, 791 (Ky. 2005). The question of substantial truth is a highly factual inquiry generally reserved for a jury and is not an issue to be resolved on a motion to dismiss where Nicholas' allegations of falsity must be accepted as true. *See, e.g.,* RESTATEMENT § 617 cmt. a ("[T]he question of whether the defamatory imputations are true is ordinarily for the jury."); *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 796 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014) (a defendant is entitled to judgment only "if the ***evidence*** supports, without contradiction or room for reasonable difference of opinion, the defense that these statements were substantially true") (emphasis added); *Clark v. Viacom Int'l Inc.*, 617 Fed. App'x 495, 510 (6th Cir. 2015) (same); *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 283 (Ky. 2014) ("Ordinarily, because the law does not presume an individual's misconduct, the falsity of defamatory statements is presumed.").

Nicholas has alleged exhaustively that the gist and discrete factual meanings published as part of NBCUniversal's coverage of the January 18 incident are false, and the question of substantial truth therefore cannot be resolved on a 12(b)(6) motion. *See, e.g., Marcum v. G.L.A. Collection Co.*, 646 F. Supp. 2d 870, 873 (E.D. Ky 2008) (holding that it would be premature to dismiss case where there was an ongoing dispute about whether the statement at issue was true).

II.    **NBCUniversal's Publications Are "Of and Concerning" Nicholas.**

      Nicholas was the face of both NBCUniversal's reporting and the larger context of the January 18 incident. Each of NBCUniversal's broadcasts, articles, and tweets singled out Nicholas from the rest of his classmates and emphasized his individual involvement (1) by showing the Viral Video or its cover image, (2) by specifically describing Nicholas' alleged misconduct, and (3) by describing defamatory alleged conduct of the students while simultaneously showing Nicholas' face. Any viewer of NBCUniversal's coverage immediately saw Nicholas' image as the face of the January 18 incident by way of NBCUniversal's repeated broadcast of the Viral Video. Indeed, Nicholas was the only student in the CovCath group singled out by NBCUniversal, and none of its accusations exclude Nicholas from the purported conduct of the students generally.

      NBCUniversal fails even to describe the legal standard for determining whether a defamatory statement is "of and concerning" a plaintiff. In Kentucky, a plaintiff does not need to be *specifically identified* in the defamatory statements so long as it could be reasonably understood by the plaintiff's "friends and acquaintances … familiar with the incident" that the statements were about the plaintiff. *Stringer,* 151 S.W.3d at 796. At the motion to dismiss stage, a court need decide only whether a jury could reasonably conclude that the defamatory words refer to some ascertained or ascertainable person. *Louisville Times v. Stivers*, 68 S.W.2d 411, 412 (Ky. Ct. App. 1934). Finally, although unnecessary in this case, this Court may look outside the four corners of NBCUniversal's publications to answer whether they are about Nicholas, which "does not affect whether the defamatory statement is per se or per quod." *E.W. Scripps Co. v. Cholmondelay*, 569 S.W.2d 700, 702 (Ky. Ct. App. 1978).

      NBCUniversal cannot rely on the group libel doctrine because *each and every* one of NBCUniversal's publications specifically referenced Nicholas and imputed to him the conduct asserted therein by either (1) broadcasting the Viral Video or its cover image with Nicholas face, (2) specifically describing Nicholas' alleged misconduct or his appearance, or (3) by describing

defamatory conduct of the students while simultaneously showing Nicholas' face via the Viral Video or its cover image.

### A.     The Group Libel Doctrine Is Inapplicable.

The group libel doctrine does not bar the actionability of any of the publications by NBCUniversal because the circumstances of each publication reasonably give rise to the conclusion that there is particular reference to Nicholas, a member of the CovCath group.  In full, RESTATEMENT § 564A sets forth this rule:

> One who publishes defamatory matter concerning a group or class of persons is subject to liability to an individual member of it if, but only if,
>
> (a) the group or class is so small that the matter can reasonably be understood to refer to the member, or
>
> (b) *the circumstances of publication reasonably give rise to the conclusion that there is particular reference to the member.*

RESTATEMENT § 564A (emphasis added).  When each publication is read in context of the individual publication and of NBCUniversal's entire coverage of the January 18 incident, in conjunction with NBCUniversal's republications of the Viral Video and its cover image of Nicholas' face, as well as use of his name, other descriptive circumstances, and NBCUniversal's own admissions that Nicholas was "the leader of" and the "face" of the January 18 incident,[13] there is no question that each publication gives rise to the conclusion that it is specifically referencing Nicholas and his alleged misconduct.  At the very least, it should be a jury question whether the circumstances of publication reasonably give rise to the conclusion that there is particular reference to Nicholas.  Because NBCUniversal's false and defamatory accusations have special personal application to Nicholas, the group libel doctrine is not an applicable defense.

### B.     Nicholas Was Specifically Identified in Each of NBCUniversal's Publications.

Moreover, each of NBCUniversal's fifteen (15) broadcasts and six (6) articles individually identified Nicholas by use of a photographic image of his face via the Viral Video and its cover

---

[13] *See* Am. Compl. ¶¶ 101, 549(d).

image.[14]  Pictures were included in the allegations for each broadcast and article in the Amended Complaint to make this clear if it was not clear in the initial Complaint.  For example, NBCUniversal's First and Second Broadcasts are representative of virtually all of its later broadcasts, in which viewers instantly saw Nicholas' face:




**Screenshot of the First Broadcast**          **Screenshot of the Second Broadcast**

In addition to publishing an image of his face as part of each broadcast and article, NBCUniversal outright admitted that Nicholas was the de facto "face" of the January 18 incident. NBCUniversal said on January 27 via its reporter Joy Reid that Nicholas Sandmann was "the teen who became the face of the [January 18 incident]."  (Am. Compl. ¶ 101).  In its Fifth Article, NBCUniversal said "[Phillips] believed the group of students were 'mocking' Native Americans, and Sandmann 'was the leader of that.'" (*Id.* ¶ 549(d)).  As a practical demonstration that Nicholas was the face of NBCUniversal's reporting on the January 18 incident, NBCUniversal broadcast an

---

[14] *See* First Broadcast (Am. Compl. ¶ 240), Second Broadcast (*Id.* ¶ 258), Third Broadcast (*Id.* ¶ 272), Fourth Broadcast (*Id.* ¶ 290), Fifth Broadcast (*Id.* ¶ 304), Sixth Broadcast (*Id.* ¶ 325), Seventh Broadcast (*Id.* ¶ 341), Eighth Broadcast (*Id.* ¶ 360), Ninth Broadcast (*Id.* ¶ 379), Tenth Broadcast (*Id.* ¶ 393), Eleventh Broadcast (*Id.* ¶ 405), Twelfth Broadcast (*Id.* ¶ 421), Thirteenth Broadcast (*Id.* ¶ 436), Fourteenth Broadcast (*Id.* ¶ 452), Fifteenth Broadcast (*Id.* ¶ 464), First Article (*Id.* ¶ 489), Second Article (*Id.* ¶ 503), Third Article (*Id.* ¶ 517), Fourth Article (*Id.* ¶ 528), Fifth Article (*Id.* ¶ 543), Sixth Article (*Id.* ¶ 552).

exclusive interview of *Nicholas* – and no other student – concerning the January 18 incident by Savannah Guthrie on the NBCUniversal's *TODAY Show* on January 23, 2019.[15]  (*Id.* ¶ 122).

Other mainstream media outlets reiterated the public sentiment that Nicholas Sandmann was the "face" of the January 18 incident.  KTXL Fox40 said "[w]e owe an apology to the students, their families, and *the face of the Covington student group, Nick Sandmann*" and said that "the focus of attention was on Sandmann." (*Id.* ¶ 59) (emphasis added).  Nicholas alleged that NBCUniversal's collective reporting conveyed to its readers that Nicholas was the face of an unruly hate mob.  (*Id.* ¶ 44).  The Diocese specifically apologized to "Nicholas Sandmann and his family." (*Id.* ¶ 135).  From the gists conveyed and the "circumstances of publication," it was obvious to any viewer – and particularly to Nicholas' friends and acquaintances – that NBCUniversal chose Nicholas as the figurehead of its entire false and defamatory coverage.

Courts routinely find publications to be "of and concerning" the plaintiff where the defendant utilizes the plaintiff's likeness in connection with the article or broadcast, even where the offending publication refers only to an indiscriminate class.  NBCUniversal's use of and reference to the Viral Video prominently featuring Nicholas ends the "of and concerning" inquiry. *See, e.g.*, *Stanton v. Metro Corp.* ("*Stanton II*"), 438 F.3d 119, 128 (1st Cir. 2006) (entire article may be of and concerning by use of plaintiff's photograph "*even in the absence of any express textual connection between the statement and the [plaintiff's] photograph*") (emphasis added). The juxtaposition of the plaintiff's photograph with a defamatory article has long been held to create an issue of fact for determining the "of and concerning" requirement. *Peck v. Tribune Co.*, 214 U.S. 185, 188-89 (1909) (finding that "[o]f course, the insertion of the plaintiff's picture in the place and with the concomitants that we have described imported that she was the nurse and

---

[15] Nicholas accepted the interview request in an attempt to stem the threats of physical violence being made against him, his family, and his CovCath classmates as a result of the false accusations about him.  (Am. Compl. ¶ 122).

made the statements set forth," despite plaintiff's photograph being captioned with another's name).[16]

In *Stanton I,* an article headlined "The Mating Habits of the Suburban High School Teenager," indiscriminately referred only to high school students and teenagers "in the Boston area." *Stanton v. Metro Corp.* ("*Stanton I*"), 357 F. Supp. 2d 369, 372 (D. Mass. 2005), *rev'd by Stanton I.*. Despite the plaintiff "not [being] named anywhere in the article" and the presence of seven photographs depicting sixteen students, the group libel defense was rejected because the plaintiff "is the central female figure in the most prominent illustration, not an unidentified member of a large and undifferentiated group," and "[b]ased on that juxtaposition alone, a reasonable reader could conclude that the teenage girl depicted in the photograph" was the target of the accusations. *Id.* at 380-81. However, the district court erroneously concluded that a disclaimer on the first page of the article explicitly stating that the "individuals pictured are unrelated to the people or events described in this story" negated the otherwise existing impression that the article was about the plaintiff. *Id.* On this point, the First Circuit reversed the district court, holding that "the presence of the disclaimer does not permit the conclusion, as a matter of law, that the article is not of and concerning Stanton." *Stanton II*, 438 F.3d at 129. Thus, despite the fact that plaintiff was not specifically named in the article, the article referred indiscriminately to students "in the Boston area," the presence of seven photographs that depicted at least sixteen people, the presence of a conspicuous disclaimer on the front page indicating that the individuals in the photographs were entirely unrelated to the article, and that "the article draws no literal connection between the subjects of the photograph and the subjects of its story," the First Circuit nevertheless held that "a reasonable reader could believe that Stanton … is in fact one of the teens whose promiscuous behavior is described in its text." *Id.* at 128, 130.

---

[16] *See also Nappier v. Jefferson Standard Life Ins. Co.*, 322 F.2d 502, 504 (4th Cir. 1963) ("These aims could not be fully achieved if only disclosure of one's proper name was forbidden."); *Wallace v. Media News Grp., Inc.*, 568 Fed. App'x 121, 124 (3d Cir. 2014) (same).




*Image that First Circuit Held Could Impute the Words of the Article to be "Of and Concerning" Stacey Stanton (The Woman Standing Second from Left).*

*Screenshot of the Cover Image from the Viral Video Depicting Nicholas Sandmann in Prominent Position.*

There is an entire body of case law holding that a publication *in its entirety* is "of and concerning the plaintiff if the speaker uses a photograph depicting the plaintiff. *See, e.g.*, *Cheney v. Dailey News L.P.*, 654 Fed. App'x 578, 581 (3d Cir. 2016) (article stating a sex scandal "implicates dozens of city employees, including … firefighters" held reasonably capable of concerning plaintiff firefighter whose photo accompanied article); *Clark v. Am. Broad. Co.*, 684 F.2d 1208, 1213 (6th Cir. 1982) (reversing trial court's grant of judgment to defendant based upon use of plaintiff's image in connection with broadcast regarding street prostitution, especially in light of commentary while photograph on screen); *Holmes v. Curtis Publ'g Co.*, 303 F. Supp. 522, 523, 527 (D.S.C. 1969) (jury issue for "of and concerning" where article included plaintiff's photograph at table with four others even though the article "does not identify or otherwise refer to plaintiff" except by his picture); *Jackson v. Consumer Publ'ns*, 11 N.Y.S.2d 462, 464 (App. Div. 1939) (jury issue where article only identified plaintiff by his picture and referred generally to dishonest auctioneers).

NBCUniversal would have this Court look only at isolated sentences, as displayed in the chart attached as Exhibit A to its Motion.  In a nutshell, NBCUniversal's erroneously argues that if the words in a sentence do not specifically mention Nicholas, then it is not "of and concerning"

25

or "about" him.  This is not the law.  The words – as they are part of each publication and NBCUniversal's entire coverage – must be construed *as a whole*.  *McCall*, 623 S.W.2d at 884. This includes an obvious consideration of the Viral Video depicting Nicholas and its cover image of his face in each publication.  This Court must view each statement and gist in the context of the whole broadcast or article – not as individual, isolated sentences.  Indeed, the Court must view NBCUniversal's entire coverage just as the initial viewer or reader would have – as part of an entire online article or television broadcast with photos, videos, and graphics, and not in a rearranged spreadsheet with words or phrases grouped together and analyzed out of context as NBCUniversal has done in its Exhibit A.  *See, e.g.*, *McCall*, 623 S.W.2d at 884 (cannot subject defamatory statements to the "critical analysis of the legal mind").

Because Nicholas was specifically identified by photograph, name, and descriptive circumstances in each of NBCUniversal's publications, the circumstances of NBCUniversal's publications reasonably give rise to the conclusion that there is particular reference to Nicholas. Under *Stivers*, a reasonable juror could conclude that the publications refer to an ascertainable person – Nicholas Sandmann – and are thus "of and concerning" him.

## III.    NBCUniversal's Accusations Are Capable of a Defamatory Meaning.

At this stage in the litigation, this Court need only decide whether NBCUniversal's accusations in context of the entire coverage were *capable* of a defamatory interpretation.  *See, e.g.*, RESTATEMENT § 614; Desai, 2018 WL 297599 at *4.  To be defamatory, it is not necessary that the accusation or other statement be by words …[; it] is enough that the communication is reasonably capable of being understood as charging something – some conduct or character of another – as being defamatory.  RESTATEMENT § 565 cmt. a, b.  When each of NBCUniversal's broadcasts, articles, and tweets is viewed in its own context and the context of NBCUniversal's entire coverage, there is no question that all of NBCUniversal's publications and the false gists contained therein are reasonably capable of bearing a defamatory meaning.

NBCUniversal bends over backwards in its motion to avoid any discussion of the false and defamatory gists created by the context of its publications.  In fact, NBCUniversal would rather have this court view its publications in a completely re-engineered format – not how the reader or viewer originally viewed the content.   This explains the existence of Exhibit A to NBCUniversal's Motion, the purpose of which is to compartmentalize, separate, and scatter fragments of publications into literal, quarantined  boxes—a spreadsheet—hoping that this Court will not read those sentences within the context of each respective publication as it is required to do under established law.  This Court cannot approach this case in the manner NBCUniversal has suggested. The Supreme Court of Kentucky has made clear:

> It is an elementary principle of the law of libel that the defamatory matter complained of should be ***construed as a whole***.  The alleged defamatory words must be measured by their natural and probable effect on the mind of the average lay reader and ***not be subjected to the critical analysis of the legal mind.***  We must, therefore, ***analyze the article in its entirety*** and determine if its ***gist or sting*** is defamatory.

*McCall*, 623 S.W.2d at 884 (emphasis added); *accord Stringer*, 151 S.W.3d at 793 n.38; *Ky. Kingdom*, 179 S.W.3d at 785.   The law requires an analysis of the context in which NBCUniversal's accusations were published to ascertain defamatory meaning.  *See, e.g.*, *Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 738 (Ky. Ct. App. 2004) ("Alleged defamatory statements must be construed in the context of the entire communication."); *Ky. Kingdom*, 179 S.W.3d at 791 ("A jury … must consider the broadcasts in their entirety when determining whether the statements and inferences within it are false and defamatory.").   Context is particularly important in analyzing television broadcasts, because such a "program may be divided into a number of video and audio segments. …[; it] is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended."  *Lasky v. Am. Broad. Cos.*, 631. F. Supp. 962, 970 (S.D.N.Y. 1986); *see also Clark*, 684 F.2d at 1214 (holding television broadcast capable of defamatory meaning due to "ambiguity created when Plaintiff's appearance is viewed within the context of Act III's focus on the effect of street prostitution on a Detroit

middle class neighborhood," which "renders the Broadcast susceptible to both a defamatory and a non-defamatory meaning").

Because defamation law requires a court to view the challenged publications in context of the individual article or broadcast and of the defendant's entire coverage, as well as within the existing societal context, this Court should ignore NBCUniversal's Exhibit A and instead determine whether each of the publications viewed in context – the broadcasts, articles, and tweets, along with their attached media such as the Viral Video – are reasonably capable of conveying a defamatory meaning. Nicholas has addressed the accusations contained in each of the broadcasts and articles *infra*, in Section III of the Facts.

### A.   The Context Establishes that the Accusations Are Defamatory.

As set forth above, it is necessary for this Court to consider the context in which the statements were made to determine whether they are defamatory. In this case, the context includes the headlines, images, embedded videos, and graphics, as well as the text or spoken statements. The context also includes how all of those elements are combined.

NBCUniversal implicated Nicholas in many of its accusations not directly by name, but by association and juxtaposition of his image at key moments. For example, the Fourth Broadcast, as currently available online, includes the large video cover image featuring Nicholas' face above the headline "Has President Trump improved America's racial tensions?" (Am. Compl. ¶ 290). The segment is described as a discussion "about President Trump's rhetoric and its effect on race relations in the U.S." (*Id*.). The segment begins by playing the Viral Video as Kendis Gibson says that the January 18 incident is "one of several recent incidents under scrutiny." (*Id.* ¶ 297(b)). By featuring the Viral Video with the close-up of Nicholas' face, NBCUniversal was explicitly tying its discussion of "race relations" and an increase in "hate crimes" to Nicholas. The statements identified in the Fourth Broadcast must be viewed in context with the images and graphics, and this Court must examine that context to determine whether "the gist or sting" of the publication as a whole is capable of bearing the defamatory meaning identified by Nicholas, *i.e.*, that Nicholas'

28

purported actions constituted a "hate crime," that Nicholas engaged in racist taunts, and that Nicholas disrupted the Indigenous Peoples March as part of his purportedly racist conduct. (Am. Compl. ¶¶ 292-95).

The Court must also consider the broader context in which the statements were made. Part of the larger context surrounding the January 18 incident was an uproar earlier that week when President Trump sent a tweet referring to Senator Elizabeth Warren as "Pocahontas" and made light of the massacres at Bighorn and Wounded Knee. (Am. Compl. ¶ 215). NBCUniversal actually inserted President Trump's entire tweet into the Second Article and directly tied together the two incidents: "Phillips said he was getting hateful phone calls and is afraid to answer his phone in the wake of the incident, which came nearly a week after Trump mocked a claim by Sen. Elizabeth Warren, D-Mass., to Native American ancestry." (*Id.*).

### B. Accusations that Nicholas Committed an Assault and Hate Crime Are Defamatory *Per Se.*

Accusations and imputations that a plaintiff committed a criminal act are defamatory *per se. See, e.g.*, *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 880-81 (E.D. Ky. 2006) (citing *Pennington v. Dollar Tree Stores, Inc.*, 28 Fed. App'x 482, 488 (6th Cir. 2002)); *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2014). The words – when construed as a whole in context of each publication and of NBCUniversal's entire coverage – must be construed in their most natural meaning and should be measured by ***the natural and probable effect on the mind of the average lay consumer*** to determine whether the plaintiff was imputed with such offense. *See Desai*, 2018 WL 297599, at *4 (citing *Yancey*, 786 S.W.3d at 795)).

In his Amended Complaint, Nicholas alleged that, throughout its publications, NBCUniversal conveyed to viewers and readers that Nicholas' conduct during the January 18 incident constituted and amounted to an assault and federal hate crime against both Nathan Phillips and the Black Hebrew Israelites. (Am. Compl. ¶¶ 28-29, 33-36, 42-44, 100, 205, 208, 247, 263, 276, 287, 293, 297-301, 307, 311, 329, 345, 364, 381, 397, 408, 425, 439, 455, 467, 493, 510, 522, 538, 548, 557, 584). For example, NBCUniversal's First Broadcast – entirely based on the

selectively edited, incomplete, and misleading Viral Video and Phillips' false factual narrative –
accused Nicholas, by broadcasting his face in the Viral Video, of interrupting Phillips' prayer and
song ceremony, instigating a confrontation with him because of his race, and surrounding,
harassing, jeering, and taunting Phillips in such a threating manner that Phillips was "scared" and
"afeared." (*Id.* ¶ 252). The Second Broadcast labeled Phillips' drum and song a "special
ceremony" related to Native American heritage and insinuated that it was Nicholas who first
witnessed this "special ceremony" and sought out a confrontation with Phillips from afar with an
intention to disrupt Phillips because of his race while he was in the midst of a peaceful, special
ceremony. (*Id.* ¶ 268(d)). The Seventh Article identified Nicholas as the "youth" who
"surrounded" Phillips in a "leering and aggressive manner" with "antagonism and hate" and who
was racially motivated to threaten Phillips because of his Native American heritage. (*Id.* ¶ 350).
The Fourth Article republished Phillips' accusation that Nicholas was "roughshodding through
[the Native Americans'] space" and "wouldn't let me move." (*Id.* ¶ 541(h), (f)). The Eighth
Broadcast republished a statement from Chase Iron Eyes, speaking from his knowledge as an
attorney, who said, "[Phillips] apprehended, he felt, there was an apprehension of a legitimate and
objective threat of harm or violence or offensive contact." (*Id.* ¶ 370(f)).

Under the District of Columbia's criminal code, "[w]hoever unlawfully assaults, ***or
threatens another in a menacing manner***" shall be fined, imprisoned for not more than 180 days,
or both. D.C. CODE § 22-404 (2013) (emphasis added). In Washington D.C., the crime of intent-
to-frighten assault involves intending "either to cause injury or to create apprehension in the victim
by engaging in some threatening conduct; an actual battery need not be attempted." *Robinson v.
United States*, 506 A.2d 572, 574 (D.C. 1986).[17] Under the federal hate crime statute, a person
who "intimidates" or "interferes with" any person because of his race, color, religion or national
original who was participating in or enjoying any benefit or facility (public accommodation or

---

[17] The crime of "intent-to-frighten assault" requires only general intent "to do the acts which
constitute the assault." *Smith v. United States*, 593 A.2d 205, 207 (D.C. 1991).

park) provided by any State, including the District of Columbia, is criminally liable. 18 U.S.C. § 245 (b)(2)(B). The National Mall is a National Park and is described as "America's front yard" [18] and is the very kind of facility and public accommodation that this statute protects. *See U.S. v. Allen*, 341 F.3d 870, 876-77 (9th Cir. 2003). It is unquestionable that, when viewed with attention to the words' natural meaning and the probable effect on the mind of the reader – not with the critical analysis of the legal mind – and in conjunction with the Viral Video republished therein and the tone of voice used by the anchors, the charge of NBCUniversal's early coverage was that Nicholas, motivated by pure racial hatred, sought to interrupt a pre-existing prayer ceremony that Phillips was conducting at the National Mall (a public accommodation and national park) by walking over to Phillips, in Nicholas' purported capacity as leader of the student group, and, with the threat to use force, started interfering with Phillips' ceremony by harassing, jeering, and mocking him in a manner comparable to that prohibited by 18 U.S.C. § 245 (b)(2)(B). In reality, and as alleged in the well-pled allegations of Nicholas' First Amended Complaint, Nicholas was merely waiting on the stairs of the Lincoln Memorial for a bus that would take him home to Kentucky when ***Phillips approached him*** and got into his face beating a drum inches from his head.

Even if these statutes did not apply, defamation law does not require the defendant to have published specific words satisfying each element of a statutory offense for it to be actionable as defamatory *per se*. *See* RESTATEMENT § 565 cmt. b ("To be defamatory . . ., it is not necessary that the accusation or other statement be by words."); RESTATEMENT § 569 cmt. d. It only requires that words be construed with their probable effect on the mind of the average lay viewer or reader. *McCall*, 623 S.W.2d at 884. The average viewer or reader would understand the gist of NBCUniversal's reporting via the juxtaposition of Nicholas' face in the Viral Video, the MAGA hat, the words "surrounding," "mocking," "targeted," "rip apart," "taunting," "roughshodding

---

[18]National Park Service, *National Mall Information*, available at https://www.nationalparks.org/explore-parks/national-mall-and-memorial-parks.

through [the Native Americans'] space," and "leader of," and the false allegation that Nicholas shouted "build the wall," to draw the unavoidable conclusion that Nicholas sought out a racially threatening confrontation with both the Black Hebrew Israelites and a Native American elder who was engaged in a peaceful ceremonial prayer. As a result, all of NBCUniversal's publications, in context of the whole coverage, are ***capable*** of a defamatory meaning because they charge Nicholas with committing an assault and a hate crime.

### C.  NBCUniversal's Accusations that Nicholas Committed Racist Misconduct Are Defamatory Per Se and Capable of a Defamatory Meaning.

Accusations and imputations of specific racist conduct, racist speech, taunting, and assault are routinely held to be defamatory *per se*.  *See, e.g.*, *Fortney v. Guzman*, 482 S.W.3d 784, 789-90 (Ky. Ct. App. 2015) ("When the communications concern untrue allegations of criminal behavior … the communication is libelous per se); *Toikka v. Jones*, 2013 WL 978926, at *3 (E.D. Ky. Mar. 12, 2013) (statement defendants "witnessed [plaintiff] push Evelyn Jones" and call her a "bitch" is libelous per se because it meets definition of assault, which is "an unlawful offer of corporeal injury to another by force"); *Toler*, 458 S.W.3d 276, 280 (accusation of racist comments in the workplace were defamatory per se); *Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 874 (S.D.N.Y. 1984) (collecting cases and holding that "[c]ourts have readily held allegations of racism … to constitute libel per se, at least when founded on specific incidents"); *Boyles v. Mid-Florida Television Corp.*, 431 So. 2d 627, 634-35 (Fla. Dist. Ct. App. 1983), *approved*, 467 So. 2d 282 (Fla. 1985) (the accusation of "taunting the retarded patients" "is something that would tend to subject one to contempt or disgrace," without regard to innuendo).

While showing a picture of Nicholas' face from the cover image of the Viral Video, an NBCUniversal commentator stated that "the KKK, the Nazis, they aren't running around in hoods and burning crosses, they're getting tiki torches and wearing Izods and pullovers …." (*Id.* ¶ 313(j)). NBCUniversal accused Nicholas of committing racist conduct: NBCUniversal admitted that *"many see"* Nicholas' purported actions as *"racist **behavior**"* and said that Nicholas is being "widely condemned." (Am. Compl. ¶ 244(c) (emphasis added).  NBCUniversal accused Nicholas

of engaging in racist taunts. (*Id.* ¶¶ 500(c)-(g), 514(g), 525(h), 549(b), 558(e)). NBCUniversal accused Nicholas of being the "leader of" the group that "roughshodd[ed] through [the Native Americans'] space." (*Id.* ¶¶ 541(f), 549(d)). Many people accept that chanting "build the wall" – specifically when purportedly directed aggressively at a Native American elder – is racist behavior. (*Id.* ¶ 211). Most egregiously, the Eleventh Broadcast drew a comparison of Nicholas' alleged conduct during the January 18 incident to the Charlottesville riots where a young woman was murdered by a neo-Nazi. (*Id.* ¶ 411(e)). All of these accusations, including accusing Nicholas of violating the fundamental standards of his school and religious community, are precisely the types of accusations that hold individuals up to public scorn.

## IV. <u>NBCUniversal's Accusations Against Nicholas Are Not Protected Opinion.</u>

NBCUniversal contends that not a single statement it made during its seven-day smear campaign of broadcasts, articles, and tweets could constitute a false statement of fact about Nicholas because it was entirely protected "pure opinion." (Mot. at 26-27). This argument fails to recognize the procedural posture of this case, the well-pled allegations in Nicholas' First Amended Complaint, and applicable law. All of NBCUniversal's publications, and its entire coverage of the January 18 incident, conveyed to its viewers and readers the gist that Nicholas committed certain actions — an assault and hate crime by "surrounding," "harassing," "taunting," "targeting," and "mocking" Nathan Phillips and the Black Hebrew Israelites — which were capable of being proven true or false and were, in fact, false. NBCUniversal relied on the false factual narrative of Phillips as the basis for its "news" reporting on the January 18 incident despite the fact that the video evidence clearly demonstrates that Nicholas was standing still, and therefore any characterization of his behavior as any type of action is necessarily false.

The fundamental question is whether the defendant's false statement can be proven true or false. *See Milkovich*, 497 U.S. at 18-19, 27; *accord Cromity*, 494 S.W.3d at 503. In *Milkovich*, the United States Supreme Court explained that "[e]ven if the speaker states the facts upon which he bases his opinion, *if those facts are either incorrect or incomplete, or if his assessment of*

***them is erroneous, the statement may still imply a false assertion of fact***." *Milkovich*, 497 U.S. at 18 (emphasis added).

An opinion that a person engaged in conduct—such as perjury, assault, harassment, taunting, or mocking—speaks of objectively verifiable events and is thus actionable if its basis is undisclosed, false, or incomplete. When determining if an opinion is actionable, a court examines the "whole context" of a publication. *Yancey*, 786 S.W.2d at 857. Nothing in NBCUniversal's publications or coverage can be privileged opinion because (1) the disclosed factual bases (the Viral Video and Phillips' factual narrative) were incorrect and incomplete, (2) NBCUniversal's deficient coverage implied the existence of undisclosed, defamatory facts beyond what is depicted in the Viral Video, and (3) NBCUniversal accused Nicholas of engaging in provably false, defamatory conduct.

### A.   Phillips' Accusations Conveyed a False Factual Narrative.

Nicholas has pled that Phillips' accusations against Nicholas were part of a false factual narrative – not statements of opinion – that are capable of being proven true or false. When examined in context, it becomes clear that certain statements or phrases that might be interpreted in certain circumstances as protected opinion are, in this case, false statements of fact that can form the basis for a defamation action.

As one example, NBCUniversal contends that this Court should treat the phrase "blocked" as it was treated in the Washington Post case and find that the word "blocked" is not capable of conveying a defamatory meaning.[19] NBCUniversal relies on the same arguments as the Post but ignores the context in which NBCUniversal republished this statement. Phillips did not just mention off-handedly that he was blocked. During a videotaped interview, Phillips described in

---

[19] This is one of the points on which Nicholas has argued for reconsideration of the Court's order in the Post litigation. NBCUniversal ignores completely the Editor's Notes published by the Post, which are described and incorporated in the First Amended Complaint against NBCUniversal, in which the Post admitted that the accusation that Phillips was, *inter alia*, "blocked," was disproven by subsequent video. (*See* Am. Compl. ¶ 60 and Ex. B).

minute detail a specific sequence of events, leaving no question that he was contending as a matter of objective fact that he was physically blocked by Nicholas:

> (Guthrie)  "…Do you think sir, you should have walked away?"

> (Phillips)  "*I was trying to walk away*.  There was a spot, there was a place where I could take my peoples, because *we were surrounded*.  We *couldn't go right.  We couldn't go left, back*, you know.  And then, I was still in prayer, still singing, and then I was looking past the crowd and I took that first step….  And from somewhere, from a clear space, a person was there (gesturing with his hand directly in front of his face)."

> (Guthrie)  "You feel you were blocked."

> (Phillips)  "Oh, I *was* blocked."

(*See* Am. Compl. ¶ 457(d)-(e) (emphasis added)).  During this portion of the interview, Phillips gestured repeatedly – for example, to the left, to the right, to the back, as he said that "we couldn't go right. We couldn't go left, back, you know."  He was obviously purporting to describe what had occurred.  When Guthrie made the statement "you feel you were blocked," Phillips answered emphatically – as though to dispel any notion that he merely *felt* he was blocked – "Oh, I *was* blocked."  When examined in context, the inescapable conclusion is that Phillips was not – as NBCUniversal would have this Court believe – "simply speculating as to Sandmann's intentions…."  (Mot. at 31).[20]  Phillips was stating a fact – albeit a false fact that was easily disproved by video evidence.  Indeed, Chase Iron Eyes reinforced that Phillips' false narrative was intended to be a factual recitation of events when he said during an NBCUniversal broadcast on January 21 that Phillips had "an apprehension of a legitimate and *objective threat* of harm or violence or offensive contact" by Nicholas.  (*See id.* ¶ 370(f) (emphasis added)).  Phillips and his followers were spreading the story that Phillips had been blocked and prevented from moving

---

[20] Somewhat euphemistically, NBCUniversal describes Phillips' very affirmative statement that "Oh, I was blocked" as "a subjective interpretation of the physical dynamic of his encounter with Sandmann…."  (Mot. at 31).  Although creative, a description of the "physical dynamic" of an "encounter" with another person nevertheless sounds a lot like an attempt to describe factually what occurred.

forward as well as being prevented from moving left, right, or back. Thus, although saying that someone was "blocked," without more, could be considered an opinion in certain instances, Nicholas has plausibly pled that, based on the context, Phillips was purporting to give a factual description of the January 18 incident when he said that "[o]h, I was blocked" and described factual events that amounted to being blocked.

Phillips' description of being "blocked" is just one example – Nicholas has properly pled in his First Amended Complaint that all of Phillips' false and defamatory statements were intended to convey a factual narrative.

### B.      NBCUniversal's Accusations Against Nicholas Were Factual.

In addition to the republication of Phillips' false factual narrative, NBCUniversal published other factual accusations that Nicholas engaged in objectively verifiable conduct. Foremost, NBCUniversal accused Nicholas of assaulting and committing a hate crime against both Phillips and the Black Hebrew Israelites, both by using the phrase "hate crime" and by describing factual circumstances communicating that an assault occurred.[21] As discussed *supra*, in Washington D.C., the crime of intent-to-frighten assault involves intending "either to cause injury or to create apprehension in the victim by engaging in some threatening conduct; an actual battery need not be attempted." *Robinson*, 506 A.2d at 574.

Additionally, accusations of racist *conduct* are not protected subjective opinions. NBCUniversal pretends that its publications merely slapped the generic label "racist" on Nicholas. Instead, NBCUniversal accused Nicholas of engaging in **specific racial misconduct** such as

---

[21] NBCUniversal makes the outrageous contention that its accusation that someone has committed a "hate crime" is a protected opinion if it also publishes a single, selectively edited cell phone video from the internet as its basis. (Mot. at 28 (referencing the Viral Video)). NBC cites no legal authority for that argument, and for good reason – this would be an utter hyperextension of the opinion defense that would effectively lay waste to the tort of defamation. A "hate crime" is a **provably false** event: a hate crime is "a felony or misdemeanor motivated by the perpetrator's prejudice, an intense bigotry, on the basis of the victim's race…." *Black's Law Dictionary* 452 (10th ed. 2014). Accusing someone of acts constituting a hate crime or an assault, when viewed in this context and presented as "news" articles and broadcasts, cannot be "rhetorical hyperbole."

targeting Phillips and "black kids" because of their race and religion.  (*See id.* ¶¶ 42, 282(g)).  NBCUniversal accused Nicholas of being the "leader of" the mob "roughshodding through [the Native Americans'] space."  (*Id.* ¶¶ 541(f), 549(d)).  In context, the message is clear: Nicholas engaged in conduct amounting to an assault and hate crime motivated by sheer racism.  Such accusations of racist conduct are not protected. *See, e.g.*, *Armstrong v. Shirvell*, 596 F. App'x 433, 441-42 (6th Cir. 2015) ("Courts have held that words like 'liar' and 'racist' have clear, well understood meanings, which are capable of being defamatory."); *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248, 1262 (2010) (rejecting opinion defense for "accusation of concrete, wrongful conduct" for statement about "racist *firings*" and "'discriminatory abuse against Latina women immigrants'").  The reason is clear:  conduct either occurred or it did not, and an accusation that someone engaged in that conduct is capable of being proven true or false.

Nor are NBCUniversal's other assertions about Nicholas' conduct – including accusations of mocking, taunting, disrespecting, and harassment – protected subjective opinions.  *See, e.g.*, *Boyles*, 431 So. 2d at 634–35 (holding that "taunting" based on an immutable characteristic may be defamatory without regard to issues of opinion).  When read together and in context from the perspective of a reasonable viewer or reader, the words used by NBCUniversal paint a picture of Nicholas' alleged, provably false conduct during the January 18 incident.

Indeed, NBCUniversal has admitted as much.  As just one example, in the Sixth Broadcast on January 21, NBCUniversal aired a segment that broadcast Nicholas' face in the Viral Video as Craig Melvin said that the Viral Video "shows a group of high school students from Kentucky *appearing to taunt a Native American elder during a rally in Washington*."  (Am. Compl. ¶ 335(b) (italics reflects voice-over while Viral Video highlighting Nicholas' face was played)).  Showing Nicholas' face while Melvin said that the students were "appearing to taunt a Native American elder" obviously directed the accusation at Nicholas.  Additionally, Melvin said that the Viral Video *shows* the group "appearing to taunt" Phillips – if the behavior is capable of being captured on video, then obviously it is capable of being proven true or false.  Indeed, NBCUniversal goes

one step further and broadcasts the caption under Nicholas' face: "STUDENT SPEAKS OUT AFTER TAUNTING CAUGHT ON TAPE."  (*Id*.).  The "student" in question was Nicholas, as he had issued a statement the night before the Sixth Broadcast, which was later discussed during the broadcast.  Thus, NBCUniversal affirmatively represented to its viewers on the morning of January 21 that Nicholas was responding to being "caught on tape" while "taunting" Phillips. Regardless of what other courts may determine about the use of the word "taunting" in different contexts, in this case, NBCUniversal made the determination that "taunting" was a factual statement capable of being proven true or false, and NBCUniversal falsely told its viewers that the "taunting" had been "caught on tape," after which Nicholas was forced to "speak[] out." NBCUniversal presented the alleged "taunting" as fact, and any reasonable reader would have interpreted it as such given NBCUniversal's assertion that it had been "caught on tape."

NBCUniversal similarly conveyed to readers of its online articles the description of students "harassing" Phillips as being "caught on film." (Am. Compl. ¶ 500(a)(ii)).  NBCUniversal added its own captions to the Viral Video that was embedded in its online articles.  One of its captions stated as a matter of fact that Phillips was harassed:



YESTERDAY STUDENTS WERE CAUGHT ON FILM HARASSING AN OLDER NATIVE AMERICAN MAN ON THE STEPS OF THE LINCOLN MEMORIAL

Students from a Kentucky Catholic High School appeared to harass and mock a Native American demonstrator during a rally in Washington D.C.

(*Id*.).  NBCUniversal thus told its readers (and viewers of the video) that students "were caught on film harassing an older Native American man" with a close-up image of Nicholas' face.

NBCUniversal's caption does not say that Phillips *felt* harassed – it says that the harassment was "caught on film."   NBCUniversal was conveying – and any reasonable viewer would have understood – as a matter of purported fact that Nicholas was harassing Phillips.

The republication of the Diocese's statement condemning Nicholas also communicated provably false defamatory facts.  By "condemn[ing]" Nicholas and the other students' "***actions***" towards Phillips and Native Americans, and by threatening "expulsion," the statement implied that actual facts existed to warrant subjecting Nicholas to public hatred, contempt, scorn, obloquy, or shame.  The implication of underlying defamatory facts is all the more pronounced because a reasonable reader may assume that Nicholas' own Diocese and school – which supervised the trip to D.C. – would know what happened. Ultimately, NBCUniversal's republication of the Diocese's statement is a proclamation that Nicholas' *conduct*, as a matter of fact, violated the standards of his religious community and the policies of his school, which takes it out of the realm of protected opinion.   NBCUniversal's election to republish these statements without any reasonable investigation is actionable.

### C.     The Disclosed Factual Bases Were Incorrect and Incomplete.

A protected opinion can exist ***only*** where the factual basis for the opinion was ***completely*** and ***correctly*** disclosed.  *Milkovich*, 497 U.S. at 18-19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact"); *Cromity*, 494 S.W.3d at 503 (applying *Milkovich* and reiterating that even if a speaker discloses the facts on which he bases his opinion, "the statement may nonetheless be defamatory if the disclosed facts are incomplete, incorrect, or if his assessment of them is erroneous."); *Yancey*, 786 S.W.2d at 854; *Lassiter*, 456 F. Supp. 2d at 881.  NBCUniversal makes the erroneous assertion that the Viral

Video was a complete and correct basis for its false and defamatory assertions about Nicholas. (Mot. at 27).  However, the Viral Video was neither complete nor correct.[22]

The Viral Video showed only 1 minute of the encounter and provided no context.  The Viral Video did not show how Phillips came to be standing directly in front of Nicholas, and it did not show how the incident ended.  It did not show Nicholas taking any action whatsoever.  In order to make a "news" story from the Viral Video, NBCUniversal relied on Phillips to fill in the context. NBCUniversal thus gave a megaphone to a biased and unreliable witness to describe what happened before and after the Viral Video without conducting any independent investigation into his story.

The 1-minute selectively edited Viral Video is incapable of providing a viewer with a complete and correct factual basis of the January 18 incident because, while the following events actually occurred and were pled in Nicholas' Amended Complaint, the Viral Video ***did not show*** (1) the Black Hebrew Israelites' misconduct and homophobic, racist slurs directed at the CovCath students for over one hour before the Viral Video even begins; (2) Nathan Phillips walking up to Nicholas first in a confrontational manner; (3) the fact that Nicholas and his classmates were simply waiting for their busses so they could go home; (4) the Black Hebrew Israelites shouting racial slurs at other Native American groups nearby for a long period of time; (5) Nicholas and his student group engaging in school cheers before Phillips approached them; (6) Nicholas engaging in any misconduct, including harassing, mocking, or taunting anyone; (7) Nicholas making any gesture of any kind except to, at times, awkwardly smile; (8) Nicholas uttering any words to Phillips or his comrades, moving into Phillips' path, blocking Phillips, or physically or verbally threatening Phillips in any manner.[23]     (Am. Compl. ¶ 103).  This incredible series of factual

---

[22] Kentucky courts adhere to *Milkovich* and its "provable as false" standard.  *See, e.g.*, *Welch v. American Publ'g Co.*, 3 S.W.3d 724, 730 (Ky. 1999); *Williams v. Blackwell*, 487 S.W.3d 451, 454 (Ky. Ct. App. 2016); *Cromity*, 494 S.W.3d at 503-04.

[23] NBCUniversal asserts that Nicholas did not allege that the Viral Video was "altered."  But Nicholas specifically alleged that the Viral Video was "selectively edited" and a highly

omissions has an impact on how a reasonable person would perceive Nicholas and the January 18 incident.  Perhaps most egregiously, NBCUniversal's lawyers want this Court to ignore (1) the admissions of NBCUniversal's own newsroom editors, who have unequivocally indicated the incorrect and incomplete nature of the Viral Video, and (2) statements made by other organizations that demonstrate the incorrect and incomplete nature of the Viral Video.

NBCUniversal broadcast the statement that the Viral Video was a "deceptively presented video." (Am. Compl. ¶ 403).  NBCUniversal said "what is *unclear* in the [Viral Video] is who actually started the confrontation." (*Id.* ¶ 434).  NBCUniversal said that "the moment (when Nicholas is seen standing with Phillips) does not start at the [Viral Video]." (*Id.* ¶ 434). NBCUniversal said that after the Viral Video was published, a "fuller picture" came into view.[24] (*Id.* ¶¶ 390-91).  NBCUniversal said, in reference to the Viral Video, "[t]his *short section of video*, part of a much longer series of exchanges, *has become a flashpoint*." (*Id.* ¶ 313(e) (emphasis added)).  In the Third Broadcast, as in many other of its broadcasts, NBCUniversal commentators implied that they had information not disclosed to their viewers in the form of other video, but they never broadcast it.  (*Id.* ¶ 283).  Nicholas specifically alleged that the Viral Video lacked sufficient context and was thereby incorrect and incomplete.  (*See id.* ¶¶ 35, 201, 207, 531, 608).

Moreover, NBCUniversal published an article titled "Twitter account that amplified Covington Catholic D.C. march video appears linked to California teacher."[25]  The article's premise is founded upon its statement that the @2020fight video (the Viral Video) was criticized for "lacking the full context of the encounter":

---

incomplete and incorrect factual basis for any of NBCUniversal's publications to be protected opinion. (Am. Compl. ¶¶ 102, 587).

[24] In reality, the Banyamyan Video was available to the public online via Facebook *before* the Viral Video even garnered viral attention: the Banyamyan video was lived streamed on Facebook in real-time as the incident occurred and was immediately available for the public to view on January 18 after the live stream was concluded.

[25] Available at https://www.nbcnews.com/news/us-news/twitter-account-amplified-covington-catholic-d-c-march-video-appears-n961981 (last visited Oct. 19, 2019).

Last Friday, @2020fight picked up a one-minute video [Viral Video] showing a throng of Covington Catholic High School students, who traveled from Kentucky to Washington for the March for Life, chanting at Omaha Tribe elder Nathan Phillips as he beats his drum and sings, and added a provocative caption: "This MAGA loser gleefully bothering a Native American protestor at the Indigenous Peoples March." The video spread rapidly and was seen by millions, but it soon faced criticism *for lacking the full context of the encounter, which also involved several Black Hebrew Israelites shouting slurs at the students.* Questions soon emerged about the account. Following an inquiry by CNN about the fake profile photo, Twitter suspended @2020fight on Monday for violating its policy on fake accounts.

(emphasis added). This article also likens Twitter's ban of the @2020fight account to the Russian disinformation campaign of the 2016 election and has an expert state that the "@2020fight account is part of a landscape, 'where bad actors monitor us and appropriate content that fits their needs.'"

The Viral Video's lack of context of the January 18 incident is also evidenced by subsequent "Editor's Notes" published by other organizations that republished the Viral Video. KTXL Fox40 published "A Note To Our Viewers About Our Covington Coverage," stating that it "lost sight of [its] standard of fairness, *context*, and accuracy" and it caused "*misinformed anger*" to fall on a group of teenagers, and "the face of the Covington student group, Nick Sandmann," who "never sought the attention, let alone the abusive treatment, [he] got." (Am. Compl. ¶ 59 (emphasis added)). KTXL Fox40 made this profound statement:

[The widespread denunciations of Nicholas and the students are] the result of cell phone video (Viral Video) presented as news: it shows a small window of reality for a short burst of time. Context, which is essential in any news report, is lacking. *Judgments are reached without the benefit of all or even most of the facts*. It is a prescription for error.

(*Id.* ¶ 59 (emphasis added)). Indeed, in this case, judgments of Nicholas were reached without the benefit of all, or even most, of the facts of the January 18 incident. The Viral Video was absolutely incapable of providing all of the facts, as it was deliberately manufactured to depict Nicholas as an aggressor. Finally, the Washington Post published an Editor's Note (only after being sued) admitting that evidence beyond the Viral Video offers "a more complete assessment of what occurred (at the January 18 incident)." (*Id.* ¶ 60).

Unlike the defendant's book in *Lassiter*, 456 F. Supp.2d 876, 880-81, which gave the reader a detailed, correct and complete factual basis on which to base an opinion throughout the whole book, the Viral Video could not and cannot form a complete and correct factual basis on which to form any sort of opinion because of its severe lack of context and factual omissions, and yet it was replayed constantly by NBCUniversal during its broadcasts and embedded into its articles even when it had reason to know better.

### D.   NBCUniversal Implied the Existence of Undisclosed, Defamatory Facts.

The Viral Video shows Nicholas standing still while Phillips beats a drum.  It does not show the events that occurred before or after that point in time, and those events are necessary for a viewer to have a complete and correct factual basis of the January 18 incident.  Even though NBCUniversal knew that, it had the audacity to imply the existence of false and defamatory facts undisclosed by the Viral Video or its coverage.  Namely, NBCUniversal implied that it had video evidence – not being shown to the viewer – that supported their charge that Nicholas was the "leader of" a mob that "needed one little spark and [they] would have descended on those 4 guys and ripped them apart," and that Nicholas and his classmates then "targeted" and "surrounded" Phillips, causing Phillips to be "scared" when he was "harassed" and "taunted" by Nicholas and his classmates, who committed an assault and "hate crime." (Am. Compl. ¶¶ 42; 101; 237; 252(c), (e); 282(g), (h); 457(a); 549(d)).  It is obvious to any reasonable viewer that what the Viral Video shows – Nicholas standing still while Phillips beats a drum – cannot on its own justify the charge that Nicholas took these actions.  As a result, a reasonable viewer would be led to believe that NBCUniversal had knowledge of facts that it did not disclose during its coverage of the January 18 incident. (*See id.* ¶¶ 283, 317, 352, 429, 443, 480-81, 495, 506, 530).

Indeed, throughout NBCUniversal's coverage, various reporters and commentators referenced and even discussed additional videos that were available but never broadcast them. During the Fifth Broadcast, for example, Peter Alexander said that the Viral Video was "part of a much longer series of exchanges…." (Am. Compl. ¶ 316).  During that broadcast, one panelist

said that "[y]ou can't separate the larger context from the video.  As much as we want to say that's one singular incident, the fact of the matter is that hate crimes are definitely on the rise."  (*Id.* ¶ 313(k)).  NBCUniversal continued during that broadcast – as it did throughout its coverage – to present only the Viral Video to its viewers.  By referencing that longer videos were available, NBCUniversal was conveying to its viewers that the longer videos supported the false factual narrative presented by Phillips and the Viral Video.

NBCUniversal's viewers were not in as good a position as NBCUniversal to determine the truth of its accusations against Nicholas.  NBCUniversal implied throughout its coverage that it had additional video that supported the conclusion that Nicholas had perpetrated a "hate crime" – in reality, the additional video proved conclusively that Nicholas was innocent of all wrongdoing.

## V.   <u>Defamation by Implication.</u>

NBCUniversal attempts to pigeonhole Nicholas' claim as one for defamation by implication (Mot. at 36), but that rule applies only where the defamatory meaning arises from the juxtaposition of *true facts* rather than from the reasonable meaning of false statements themselves, whether individually or in combination.  Here, the defamatory meanings arose directly from NBCUniversal's publication of false facts, and those facts, themselves, conveyed in context the defamatory meanings.  *See, e.g.*, *Nichols v. Moore*, 477 F.3d 396, 402 (6th Cir. 2007); *Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, 85 F.3d 383 (8th Cir. 1996) ("The touchstone of implied defamation claims is an artificial juxtaposition of two true statements or the material omission of facts that would render the challenged statement(s) non-defamatory.").  Straight defamation claims are not limited strictly to the words written by the defendant; defamation claims look to the defamatory meaning, the "gist" or "sting" of statements and publications, which Nicholas has properly alleged.  *Cf. McCall*, 623 S.W.3d ,at 884 ("It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole.  The alleged defamatory words must be measured by their natural and probable effect on the mind of the average lay consumer and not be subjected to the critical analysis of the legal mind.  We must,

44

therefore, ***analyze the article in its entirety and determine if its gist or sting is defamatory***.") (citations omitted) (emphasis added).

Thus, Nicholas' claim is not an action for defamation by implication, because NBCUniversal published demonstrably false facts that were defamatory of Nicholas, and the gist of each of its publications was false and defamatory.

## CONCLUSION

For the reasons identified herein, the Defendant's Motion should be DENIED.

Respectfully submitted this 21st day of October, 2019.

**L. LIN WOOD, P.C.**

*/s/ L. Lin Wood*
L. Lin Wood (*pro hac vice*)
lwood@linwoodlaw.com
Nicole Jennings Wade (*pro hac vice*)
nwade@linwoodlaw.com
G. Taylor Wilson (*pro hac vice*)
twilson@linwoodlaw.com
Jonathan D. Grunberg (*pro hac vice*)
jgrunberg@linwoodlaw.com

1180 W. Peachtree Street, Ste. 2040
Atlanta, GA 30309
Tel: 404-891-1402
Fax: 404-506-9111

**Hemmer DeFrank Wessels PLLC**

*/s/ Todd V. McMurtry*
Todd V. McMurtry
Kentucky Bar No. 82101
tmcmurtry@hemmerlaw.com
Kyle M. Winslow
Kentucky Bar No. 95343
kwinslow@hemmerlaw.com

250 Grandview Drive, Ste. 500
Ft. Mitchell, KY 41017
Tel: 859-344-1188
Fax: 859-578-3869

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

/s/ Nicole Jennings Wade

Plaintiff's Counsel