UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | |
|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,**<br><br>Plaintiffs,<br><br>v.<br><br>**NBCUNIVERSAL MEDIA, LLC,**<br><br>Defendant. | Civil Action No. 2:19-cv-00056-WOB-CJS<br><br>Judge William O. Bertelsman<br>Magistrate Judge Candace Smith<br><br>**DEFENDANT NBCUNIVERSAL MEDIA, LLC'S REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS** |

## I. INTRODUCTION

In its October 28 ruling in *Sandmann v. WP Company LLC* ("Washington Post Case"), Civil Action No. 2:19-00019-WOB-CJS (E.D. Ky. Oct. 28, 2019) (Doc. 64), this Court made clear that the bulk of the Washington Post's reporting on the January 19, 2019 incident at issue here was either not of and concerning Plaintiff, not defamatory, or protected opinion. The analysis underlying the October 28 ruling applies with equal force to NBCUniversal's reporting, such that no more than six statements set out in Plaintiff's First Amended Complaint should survive dismissal in this case.

Faced with that reality, Plaintiff has opted to press a theory unsupported by any precedent. Plaintiff's novel theory relies on an assault on the character of Nathan Phillips ("Phillips"), the Native American who Plaintiff stared down on the steps of the Lincoln Memorial. According to Plaintiff, Phillips's history of political activism is proof that he lied about the encounter. Apparently, Phillips's interest in, and past actions on behalf of the rights of indigenous people, render him so biased that he cannot be trusted to provide an accurate account of events to which he was an

eyewitness. And this bias, and its purported effect on his credibility, is apparently so obvious that it was actionable for NBCUniversal to report his eyewitness account. This theory underlies Plaintiff's decision to add 163 paragraphs to his amended complaint attempting to assassinate Phillips's character.

As a legal matter, Plaintiff's argument completely misses the point. Whether Phillips's statements are actionable are not determined by his political leanings. So long as the facts underlying Phillips's opinions were accurately disclosed, those opinions are protected.

It is undisputed that Phillips and Sandmann came to be standing face to face on the steps of the Lincoln Memorial. It is undisputed that as Phillips played his drum, Sandmann maintained his position and smiled continuously, with his face inches away from Phillips's face. It is undisputed that while Sandmann and Phillips stood facing each other inside the large crowd, many of Plaintiff's classmates engaged in mock chants and tomahawk chops. The video, upon which much of the commentary was based, accurately captured all of this. Phillips's political beliefs do not create these facts or alter them in any way. Phillips's *interpretation* of these facts may not be universally shared, and people may disagree with his interpretation in part because they believe his political leanings may cloud his judgment. But the relevant facts were disclosed, and people could reach their own competing interpretations, for their own reasons.

NBC acknowledges that with respect to Phillips's statements about being blocked, the Court has determined in the Washington Post Case that discovery may be necessary before these cases can be fully dismissed. *See* Washington Post Case (Doc. 64). However, whether on a motion to dismiss or at the summary judgment stage, Plaintiff's efforts to narrow the opinion privilege to save his claims under the circumstances at hand here would result in a wholly unworkable process for reporting news based on the accounts of eyewitnesses and participants in events.

Both through application of the Court's decisions in the Washington Post Case, to which we turn first below, and pursuant to the points and authorities in NBCUniversal's main memorandum in support of its motion (Doc. 29-1), the Amended Complaint should be dismissed, or, at a minimum, confined to the same scope as the Court has deferred for further proceedings in the Washington Post Case.

II.  **ARGUMENT**

   A.  **Application of the Court's Orders in the Washington Post Case to this Case**

At the outset, before responding to Plaintiff's legal arguments in opposition to NBCUniversal's motion to dismiss, NBCUniversal believes it is important to clear the underbrush in this case through application of this Court's rulings in its October 28, 2019 Order in the Washington Post Case. In that Order, which denied, in part, Plaintiff's Motion to Reconsider the Order granting the Washington Post's Motion to Dismiss (Doc. 47, July 26, 2019), this Court reiterated its decision to dismiss 30 of the 33 allegedly defamatory statements published by the Washington Post. The effect of the October 28, 2019 Order is that only *three* statements—all made by Phillips regarding whether Sandmann "blocked" him or denied him the opportunity to retreat—remain at issue in that case. The Court confirmed its previous July 26, 2019 ruling that the other 30 statements on which Sandmann based his defamation claims against the Washington Post are not actionable. The Court's October 28, 2019 Order should have the following implications for this case:

   1.  This Court has ruled that statements related to the group activity are, as a matter of law, not of and concerning Sandmann. This Court correctly held in its July 26 Order in the Washington Post Case (reiterated in its October 28 Order): "Like the statements about groups or classes such as 'the Stivers clan'; Kentucky Fried Chicken restaurants; and 'teachers,' statements such as 'hat wearing teens,' are clearly 'made against an aggregate body of persons,' and thus 'an

3

individual member not specifically imputed or designated cannot maintain an action.'" Washington Post Case (Doc. 47) (internal quotations and citations omitted).

Therefore, statements that merely reference "the students" or "teens," or that described the group "swarming" or "surrounding" Phillips, are not "of and concerning" Sandmann. (*See* Washington Post Case, Doc. 47, "Statement No." 1 and 2.) Nor are statements that referred to the "teens" chanting "Build that Wall" or otherwise "taunted," "accosted," "mocked," or "jeered." (*See id.* "Statement No." 3, 4, 6, 7, 8, 9, 22, 23 and 27.) These statements are identical to, or consistent with a number of statements on which Plaintiff bases his claims in this case. Attached hereto as Exhibit A is a chart listing the statements allegedly made by NBCUniversal that are identical to or consistent with these dismissed Washington Post statements.

2. This court also ruled in its July 26 Order in the Washington Post Case that statements constituting opinion or hyperbole are not actionable. Thus, Nathan Phillips's statements that he "felt threatened" and "suddenly swarmed," as well as his statements that "it was getting ugly," are nonactionable opinion. (*See* Washington Post Case, Doc. 47, "Statement No." 1, 2 and 32). Similarly, descriptions of Sandmann and his fellow students as "taunting," "disrespect[ing]," "confronting," engaging in "aggressive physicality," "jeering," "smirking," "accosting," engaging in "physical intimidation," "mocking," and "mimicking," are all nonactionable opinion. (*See id.* at "Statement No." 3, 4, 5, 6, 7, 13, 14, 16, 18, 22, 23, 25, 28, 29, 30, 31 and 32). Exhibit A lists the statements allegedly made by NBCUniversal that are identical to or consistent with these dismissed Washington Post statements. Thus, consistent with this Court's October 28 Order in the Washington Post Case, the Court should dismiss Plaintiff's defamation claims in this case that are based on these statements.

4

3. The Court expressly ruled in its July 26 Order in the Washington Post Case that labeling a person as a "racist" is a matter of opinion. (*See* Washington Post Case, Doc. 47, "Statement No." 24).[1] Exhibit A lists the statements allegedly made by NBCUniversal that are identical to or consistent with these dismissed Washington Post statements. Consistent with this Court's Order in the Washington Post Case, the Court should dismiss Plaintiff's defamation claims in this case that are based on these statements.

4. The Court also ruled in its July 26 Washington Post Order that a number of statements at issue are not defamatory. Statements reporting that the teens chanted "Build that Wall," and accounts of the Covington Diocese's condemnation of the teens' behavior, are not defamatory. Nor is a statement that the teens conduct "resurfaced tensions that have been simmering since President Trump's campaign began." (*See* Washington Post Case, Doc. 47, "Statement No." 4, 5, 6, 7, 8, 9, 12, 13, 14, 17, 19, 20, 21, 23, 26, 28, 29, 31 and 32). Exhibit A lists the statements allegedly made by NBCUniversal that are identical to or consistent with these dismissed Washington Post statements. Thus, consistent with the Court's Order in the Washington Post Case, the Court should dismiss Plaintiff's defamation claims in this case that are based on these statements.

5. What remains: The effect of the Court's July 26 and October 28 Orders in the Washington Post Case, as applied to this case, is that at most only a handful of statements should remain at issue. Those are statements in which Phillips described being "blocked" and "unable to retreat," which appear in the Tenth and Fourteenth Broadcasts (Doc. 23 (FAC), ¶¶ 402(c) & ¶ 457(d), (e)), and the First, Fifth, and Sixth Articles (*id.* at ¶ 500(f) and ¶ 549(c)):

---

[1] As discussed below in Section II.E, a recent appellate decision in South Carolina provides further support for this ruling.

- Tenth Broadcast, ¶ 402(c) – Gabe Gutierrez pointing out Phillips's conflicting statements on being blocked.
- Fourteenth Broadcast, ¶ 457(d) – "We couldn't go right. We couldn't go left, back you know."
- Fourteenth Broadcast, ¶ 457(e) – "Oh, I was blocked."
- First Article, ¶ 500(f) – "He just blocked my way and wouldn't allow me to retreat."
- Fifth Article, ¶ 549(c) – "'I was blocked,' Phillips said."
- Sixth Article, ¶ 558(c) – "'Oh, I was blocked,' he said."

Every other allegedly actionable statement in this case should be dismissed for the reasons stated above.

### B.     Plaintiff's "Factual Background"

In his memorandum in opposition, Plaintiff does not refute the thorough factual recitation offered by NBCUniversal. (Doc. 29-1 (Def.'s Mot. to Dismiss), Page ID#: 555-71.)  Instead, he repeatedly complains that NBCUniversal's arguments and reliance on a chart of challenged statements purportedly omit critical "context."  But that "context" was fully laid out in plain view in NBCUniversal's Statement of Facts, which demonstrates that NBCUniversal provided continuing multi-faceted coverage of, and commentary on, an evolving news event and the viral national discussion that flowed from it. Included in that coverage were lengthy interviews with Phillips and Sandmann—the two protagonists. Each offered their eyewitness accounts of the underlying event. This included their own feelings and perceptions of what happened that day. So, for example, Phillips stated that he felt "scared" and "afeared," (Doc. 23 (First Am. Compl.), Page ID#: 349-50, ¶ 252(f), (i), (k)), while Sandmann offered his opinion that he was "not disrespectful to Mr. Phillips." (Doc. 22, Ex. B to Motion to Dismiss, "Twelfth Broadcast.")

The coverage also included a variety of commentators who offered their opinions on the impact of the encounter and what it said about the state of our country. Over the course of nine days, over a dozen newscasters or commentators weighed in, each offering their own perspective. Given

6

the format of the presentation, these commentators did not purport to present "just the facts," but instead reviewed the images showing the encounter between Sandmann and Phillips and reacted to it. Some commentators opined that Sandmann and his classmates acted disrespectfully. (*See, e.g.,* Doc. 23 (First Am. Compl.), Page ID#: 385, ¶ 377 (the "Ninth Broadcast").) Another commentator opined that the country had "lost our damn fool minds" through its intense focus on the event. (*See* Doc. 22, Ex. B to Motion to Dismiss, "Eleventh Broadcast.").

But in Plaintiff's version of the facts, there was no nuanced discussion from a variety of commentators, there was only a relentless "false factual narrative." What makes that narrative false in Plaintiff's view is not a misrepresentation of any underlying facts, but rather the conclusions drawn from the facts. That is, Plaintiff contends that he is not a racist, and in no way intended to act disrespectfully towards Phillips. Thus, anyone who arrived at a different conclusion based on the same underlying and disclosed facts, and then stated that conclusion on NBC or MSNBC, exposed NBCUniversal to liability for hundreds of millions of dollars in damages.

But it is Plaintiff's own statement of facts that is centered on a false narrative. Plaintiff states: "The Viral Video captured a moment in time -- it did not show what happened before or after the clip." (Doc. 36 (Pl.'s Resp.), Page ID#: 663.) Although literally true, the statement is meaningless. Every image captures a "moment in time." By definition, that means that every image fails to show what happened before or after the image was captured. But that does not make the image itself false.

The critical question, which Plaintiff glosses over, is whether the Viral Video accurately displays the moment in time depicted. The possibility that other videos may have changed opinions about how to characterize the conduct depicted in the Viral Video, as Plaintiff argues, is pure

7

speculation. Moreover, the other "undisclosed" videos that Plaintiff contends NBCUniversal should have shown its audience do not render what **was** shown to that audience false or defamatory.

Had previous footage from that day, for example, disclosed that Sandmann and Phillips were in fact actors staging a confrontation, a hypothetical factual statement representing that the Viral Video portrayed an actual confrontation between Phillips and Sandmann would have been false. But it is disingenuous to suggest that because the Viral Video disclosed only a "moment in time," the Viral Video itself is capable of being proven false, or that opinions based on the images depicted in the Viral Video implied the existence of undisclosed false and defamatory facts.

The Viral Video discloses events, i.e., facts, that did occur, and Plaintiff does not allege that the longer video renders the events shown false. Plaintiff damages his credibility further by mischaracterizing the content of certain of the articles on which he has sued. For example, Plaintiff argues that the First Article states that "Nicholas was 'caught on film' harassing Phillips," and that he "surrounded" Phillips. (*Id.* at Page ID#: 666.)  The First Article says no such thing. (*See* Doc. 23-8 (Ex. H to First Am. Compl.).) Indeed, the First Article makes no mention of Sandmann by name, referring only to unspecified "students."

Plaintiff also contends that the Second Article states that "Nicholas and the students" shouted "[b]uild the wall." (Doc. 36 (Pl.'s Resp.), Page ID#: 666.) It does not. (*See* Doc. 23-9 (Ex. I to First Am. Compl.).) Instead, the article quotes Phillips as stating that he heard "Chants of 'Build the wall' and other things that were even worse," without attributing the comments to any particular student or individual. (*Id.*at Page ID#: 473.) Thus, it is Plaintiff's version of the facts at hand that paints a "false narrative" of NBCUniversal's reporting.

8

### C.     Defamatory Meaning

The Court's discussion of "defamatory meaning" in its July 26 Order in the Washington Post Case is directly applicable to Plaintiff's claims in this case. As the Court explained, "[i]n determining whether a writing is libelous per se [under Kentucky law], courts must stay within the four corners of the written communication. The words must be given their ordinary, natural meaning as defined by the average lay person. The face of the writing must be stripped of all innuendos and explanations." Washington Post Case, July 26 Order, at *20 (Page ID#: 463) (internal quotations omitted).

Plaintiff contends NBCUniversal "conveyed to viewers and readers that Sandmann's conduct during the January 18 incident constituted and amounted to an assault and federal hate crime against both Phillips and the Black Hebrew Israelites." (Doc. 36 (Pl.'s Resp.), Page ID#: 685.) To support this bald assertion, Plaintiff argues (for example) that the First Broadcast "accused Nicholas . . . of interrupting Phillips' prayer and song ceremony, instigating a confrontation with him because of his race, and surrounding, harassing, jeering, and taunting Phillips in such a threatening manner that Phillips was 'scared' and 'afeared.'" (*Id.* at Page ID#: 685-86.)

But nowhere do the words "assault" or "hate crime" appear in the First Broadcast. Rather than strip the language of all innuendo and explanations, Sandmann does precisely the opposite. This Court rejected Sandmann's inverted analysis in its July 26 Washington Post Order, writing: "Sandmann's reasoning is precisely the type of 'explanation' and 'innuendo' that 'cannot enlarge or add to the sense or effect of the words charged to be libelous, or impute to them a meaning not warranted by the words themselves.'" Washington Post Case, July 26 Order, at *21.

9

Moreover, although Plaintiff complains that NBCUniversal segregated the alleged actionable "statements" so as to strip them of their context within the publications at issue, it is Plaintiff who cherry picks words and strings them together to create statements that appear nowhere in NBCUniversal's publications. For example, Plaintiff argues that the terms "surrounding," "mocking," "targeted," "rip apart,"[2] "taunting," roughshodding through [the Native Americans'] space," and "leader of," combined with "build the wall," led reasonable listeners to the "unavoidable conclusion that Nicholas sought out a racially threatening confrontation . . ." that constituted "an assault and a hate crime." (Doc. 36 (Pl.'s' Resp.), Page ID#: 687-88.) There is no statement in any of the publications that remotely resembles such an allegation about Plaintiff, and indeed, no publication contains all of these words together.

### D. Opinion

Plaintiff argues that even in a case where the Kentucky law of opinion is otherwise applicable, that defense is unavailable at the motion to dismiss stage so long as Plaintiff plausibly alleges that the speaker's bias causes him to offer an insincere opinion.

It appears that with this argument Plaintiff is attempting to graft on to defamation law a doctrine of fraud law, which provides that an opinion may be actionable as fraud if the speaker does not actually believe the opinion when offered. *See, e.g., Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 53 (Ky. 2018) (holding that accounting firm's tax opinion was actionable because of evidence that firm did not believe its own opinion). But unlike defamation, fraud requires proof that the plaintiff reasonably relied on the opinion in taking some action. *See id.* at 45 (setting forth the

---

[2] In fact, the term "rip apart" does not appear anywhere in Plaintiff's Amended Complaint. Rather, the quote Plaintiff appears to be referring to is Phillips's statement that what he was "seeing was the fabric of America being torn apart." (Doc. 23 (First Am. Compl.), ¶ 558(d).) This statement does not refer to Plaintiff's encounter with Phillips, much less suggest Sandmann had committed an "assault" or a "hate crime."

elements of fraud). Since there is no reliance element in a defamation claim, whether a speaker believes or does not believe an opinion presents no greater risk of injury than any other nonactionable opinion. The sole question is whether the opinion implies the existence of undisclosed defamatory facts. *See e.g., Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732 (Ky. Ct. App. 2004) (citing Restatement (Second) of Torts, § 566 (1977)). Thus, whether Phillips actually believed what he said or not is wholly irrelevant to the objective question whether his statements were opinion, and if so, whether they nevertheless implied the existence of undisclosed facts (which they did not).

Furthermore, Plaintiff's position is belied by the Court's decisions in *Lassiter v. Lassiter*, 456 F. Supp. 2d 876 (E.D. Ky. 2006) and *Loftus v. Nazari*, 21 F. Supp. 3d 849, 854 (E.D. Ky. 2014). In both cases, this Court found as a matter of law that the allegedly actionable statements at issue were protected opinion, despite obvious bias on the part of the speakers.

In *Lassiter*, an ex-wife accused her husband of adultery. 456 F. Supp. 2d at 882. The husband denied that he had committed adultery, but the court found that because the ex-wife had disclosed the underlying facts, the statement was protected opinion. *Id.* One is hard pressed to imagine a more biased speaker than a spouse who believes her husband cheated. But bias of the speaker is not at issue in determining whether a statement is opinion.

Similarly, *Loftus* involved a former plastic surgery patient who alleged her doctor had disfigured her. 21 F. Supp. 3d at 854. Again, this court deemed those statements protected opinion as a matter of law. *Id.* Neither the ex-patient's bias, nor evidence proffered by the doctor establishing that the surgery was performed properly, was deemed relevant. *Id.*

11

Indeed, Plaintiff's theory is also completely unworkable in practice. This case illustrates why. Here, a news outlet reviewed a video that shows two people standing face to face occupying the same space. When asked about the interaction, one of the involved parties commented that in the moment, he was "blocked." According to Plaintiff, before a news outlet could publish that eyewitness account, the news outlet would need to do an exhaustive investigation to determine if the eyewitness had some bias. Plaintiff does not explain how a news outlet should factor in purported bias to its publication decision, but apparently, publishing an eyewitness's opinion about what he experienced would put the publisher at risk of a libel suit, even if the opinion or characterization is not plainly contradicted by available video evidence placing the eyewitness at the scene.[3] The court would apparently have to conduct a trial within a trial to peer into the heart and mind of the eyewitness whose opinion of what he witnessed was at issue to determine if the words and narrative he used to describe what he saw were sincere.

Turning to another category of challenged statements, namely, comments by MSNBC guests describing Plaintiff's conduct as "racist," a recent decision by the South Carolina Court of Appeals, involving similar statements about high school students, adds support to the unavoidable conclusion that the statements in this matter clearly constituted protected opinion. *See Garrard v. Charleston County Sch. Dist.*, --- S.E.2d ---, 2019 WL 5778086 (S.C. Ct. App. Nov. 6, 2019). In *Garrard*, several members of a high school football team brought suit against a newspaper's publisher based on an editorial in which they were referred to as "racist douchebags" for having allegedly participated in "racially-motivated post-game celebration rituals." The ritual consisted of smashing watermelons and making "monkey noises" following victories over other high school football teams.

---

[3] And even where the other participant in the encounter later expresses his view in an interview that he had "every right" to stand his ground.

12

Consistent with this Court's July 26 Order in the Washington Post Case, the South Carolina court explained that "[s]tatements such as opinion, satire, epithets, or rhetorical hyperbole cannot be the subject of liability for defamation." *Garrard*, 2019 WL 5778086, at \*10. *See also* Washington Post Case, July 26 Order, at \*16 (providing examples of "'loose, figurative,' 'rhetorical hyperbole'"). The South Carolina court went on to find that the term "racist douchebag" could not be "reasonably interpreted as stating actual facts" about the plaintiffs. *Id.* at \*11. The court further held that "whether someone 'more or less behaved like [a] racist douchebag' or whether someone condoned an act that was 'racist' is susceptible to varying viewpoints and interpretations." *Id.*

In support of its conclusion, the court explained that "[o]ne person may view certain behavior as disrespectful or offensive, but another person might view the same behavior as non-controversial and socially acceptable." *Id.* The court also cited a laundry list of cases from other jurisdictions in which courts have held that "referring to someone as 'racist' is an expression of one's opinion and is not actionable as defamation." *Id.* at \*11 n.12 (citing *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988); *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976); *Meissner v. Bradford*, 156 So.3d 129 (La. Ct. App. 2014); *Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994); *Silverman v. Daily News, L.P.*, 129 A.D.3d (N.Y. App. Div. 2015); *Covino v. Hagemann*, 627 N.Y.S.2d 894 (N.Y. Sup. Ct. 1995)).

Here, none of the language used to describe the students, or Plaintiff specifically, approaches anything nearly as strong as "racist douchebag." The use of the term "racist" was confined to describing the behavior depicted on the Viral Video. What people saw in that video is, as this Court and the *Garrard* court explained, subject to varying interpretations. The statements in which that word appears thus constitute opinion, and cannot be the basis for a defamation claim as a matter of law.

13

### E. Defamation by Implication

Plaintiff argues that he has not asserted a claim for defamation by implication, suggesting that the "rule applies only where the defamatory meaning arises from the juxtaposition of *true facts* rather than from the reasonable meaning of false statements themselves, whether individually or in combination." (Doc. 36 (Pl.'s Resp.), Page ID#: 700.) Plaintiff thus concedes that this Court should not look behind the plain meaning of the words used. As previously explained, none of the statements are capable of defamatory meaning when stripped of all innuendo and explanation, although NBCUniversal acknowledges that this Court has determined that the question of Phillips's "blocked" statements must be resolved on summary judgment, rather than on motion to dismiss.

### III. CONCLUSION

Plaintiff's case is fundamentally based on the premise that the repeated broadcast of images of him standing face-to-face with Phillips defamed him because those viewing the images may have formed mistaken impressions about his motives and character. But defamation law does not protect people against others forming negative opinions about them based on objectively true facts. The law of defamation only protects against statements that convey objectively false and defamatory facts. No such statements were made in this case.

Accordingly, NBCUniversal respectfully requests that the Court **GRANT** its Motion, and dismiss the First Amended Complaint with prejudice.

        Respectfully submitted,

        /s/ John C. Greiner
        John C. Greiner (*Pro Hac Vice*)
        GRAYDON HEAD & RITCHEY LLP
        312 Walnut Street, Suite 1800
        Cincinnati, OH 45202
        Phone: (513) 629-2734
        Fax: (513) 333-4316
        jgreiner@graydon.com

        &

        J. Stephen Smith (KBA #86612)
        Darren W. Ford (KBA #95373)
        GRAYDON HEAD & RITCHEY LLP
        2400 Chamber Center Drive
        Suite 300
        Ft. Mitchell, KY 41017
        Phone: (859) 578-3070
        Fax: (859) 578-3071
        ssmith@graydon.com
        dford@graydon.com

        ATTORNEYS FOR DEFENDANT

9868625.5